**In re PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Debtor.**

**Bankruptcy No. 88–0043.**

United States Bankruptcy Court, D. New Hampshire.

Aug. 30, 1993.

Richard Levin, Thomas E. Garcin, Stutman, Treister & Glatt, Los Angeles, CA, Thomas R. Jones, Kevin J. Burke, Cahill, Gordon & Reindel, New York City, Charles P. Normandin, Harold J. Marcus, Ropes & Gray, Boston, MA, Catherine E. Shively, PSNH, Manchester, NH, for debtor.

R. Carl Anderson, Sulloway Hollis & Soden, Concord, NH, local counsel to debtor.

Michael J. Farrell, Richard H. Klapper, Marilyn Fisch, First Boston Corp., New York City, Financial Advisor to debtor.

Gerri Karonis, Manchester, NH, for U.S. Trustee.

E. Franklin Childress, Boston, MA, U.S. Trustee.

Mark Vaughn, Devine, Millimet & Branch, Manchester, NH, Harold T. Judd, Asst. Atty. Gen., Office of Atty. Gen., Concord, NH, for State of NH.

George A. Hahn, Hahn & Hessen, New York City, for examiner.

Geoffrey B. Kalmus, Kramer, Levin, Nessen, Kamin & Frankel, New York City, for Creditors' Committee.

J. Michael Deasy, Deasy & Dwyer, Nashua, NH, local counsel for Creditors' Committee.

Howard J. Berman, Greenberg & Taurig, New York City, for Equity Committee.

Lee E. Buchwald, Rothschild, Inc., New York City, Financial Advisor to Equity Committee.

John B. Nolan, Day, Berry & Howard, Hartford, CT, for Northeast Utilities.

Noel E. Hanf, Stephen Karotkin, Wiggin and Dana, New Haven, CT, for United Illuminating.

Barbara J. Gould, George Wade, Shearman & Sterling, New York City, for Citicorp. & CUC.

## MEMORANDUM OPINION ON FINAL FEE AWARDS AND RELATED MATTERS
### TABLE OF CONTENTS

| | | PAGE(S) |
|-------|-------------------------------------------|----------|
| I. | Introduction | 406–07 |
| II. | Fee Awards To Date | 407 |
| III. | The "Enhancement" Requests | 407–09 |
| IV. | Factual Context: 1988–1990 | 409–11 |
| V. | Legal Standards: The Logical Problem | 411–19 |
| VI. | Synthesis Of The Standards | 419–21 |
| VII. | Who Brought The Value? | 421–24 |
| VIII. | Stutman, Treister & Glatt | 424–28 |
| IX. | First Boston Corporation | 428–37 |
| X. | Rothschild, Inc. | 437–45 |
| XI. | Paul L. Gioia, Examiner | 445–51 |
| XII. | United Illuminating Company | 451–56 |
| XIII. | Conclusion | 456–61 |

JAMES E. YACOS, Bankruptcy Judge.

### I. INTRODUCTION

This opinion deals with the remaining final fee awards in what is hopefully the last chapter in this unprecedented reorganization in the bankruptcy courts of an operating and regulated monopoly public utility company.[1] The present case was the first reorganization to squarely present the problems of an oper-

---

1. There were in fact utility reorganizations under equity receiverships or earlier bankruptcy laws in the 1920's and the 1930's but those cases primarily involved utilities in trouble due to improper financial manipulations by other entities under various layers of utility holding company mechanisms. Indeed, it was only with the enactment of the Bankruptcy Code of 1978 that cer-

ating utility burdened by an excess cost nuclear power plant in which the filing was necessitated by the manifold questions of allocation of that investment, and the absorption of non-recoverable costs, between creditors, stockholders, and ratepayers. These questions ultimately had to be resolved in a forum in which the regulatory agencies involved were only parties-in-interest among many others to the ultimate determination of those conflicting demands necessary to implement the Federal Bankruptcy Code as well as other federal and state regulatory laws.

As such, this case at the time of its filing was indeed unique and unprecedented. All of the professionals involved in this reorganization effort were congratulated by the Court at confirmation in handling a unique and complex case with relative expedition culminating in a successfully confirmed reorganization plan. Unfortunately for the Court certain of the professionals were not completely happy receiving only congratulations, and their various fee awards, and have sought upward adjustments (variously referred to as "enhancements", "bonuses", or "premiums")[2] to the lodestar base level reasonable fee calculated by multiplying reasonable hourly rates by the number of hours reasonably expended in performing the professional's services in the case. One applicant, United Illuminating, seeks a special "substantial contribution" award under a separate statutory provision.

These requests for upward adjustments of the "lodestar level" fee (hereinafter referred for brevity as "enhancement" requests) are

recognized in the applicable case law in this Circuit but require a specific showing of the justification therefor by the applicant and a careful evaluation of that showing and of the record of the case by the Court in that regard. This case by its nature has meant that that review by the Court has been quite time-consuming and often interrupted by other pressing Court business which tends to destroy the continuity of that review. At long last, however, the Court has completed its necessary review and this Opinion deals with all remaining pending final fee award requests.

## II. FEE AWARDS TO DATE

The professional fees and expenses paid to date in this case total $50,306,448.17. A breakdown of this amount is included as Annex "A" to this opinion listing all such prior fee awards.[3] If the requested enhancements are included in the final fee awards of the parties so requesting, then the total final fee awards in this case would be $59,161,741.17. To that amount would be added an additional $2,980,000.00 if a pending request for a § 503(b) "benefit to the estate" administrative claim allowance is granted to United Illuminating Company. United Illuminating Company was one of the competing bidders for the acquisition of the debtor during the reorganization proceedings. Northeast Utilities ultimately was the successful "high bidder" and acquired the company under the confirmed reorganization plan.

## III. THE "ENHANCEMENT" REQUESTS

The following are the specific enhancement and contribution requests remaining for decision for the Court:

tain restructuring provisions included within the bankruptcy laws arguably provided the fulcrum for resolving these conflicting issues in the federal reorganization court under the preemption doctrine notwithstanding claims of complete and absolute jurisdiction by the regulatory agencies involved. See In re PSNH, 99 B.R. 506 (1989).

2. The fee applicants use phrases such as "bonus fee," "premium fee," and "enhanced fee" interchangeably. Further, the Supreme Court has distinguished between "fee multipliers" and "fee enhancements." Pennsylvania v. Delaware Valley Citizens' Council, 483 U.S. 711, 720, 107 S.Ct. 3078, 3084, 97 L.Ed.2d 585 (1987). This

Court adopts the phrase "enhancement of fee award" as a more accurate description of the nature of the requested court action.

3. As is indicated by the notations to Annex "A", certain amounts although already "paid" pursuant to interim allowances are nevertheless subject to objections requesting downward adjustment and refund of portions of those amounts. These objections relate to some of the same parties who are requesting upward adjustments of their fees. For simplicity, neither pending upward or downward adjustment requests are included in the $50,306,448.17 total given above.

*Stutman, Treister & Glatt,* as general counsel to the debtor-in-possession, requests a final fee award of $7,500,000. This would be an enhancement of $3,155,293 over the $4,344,707 which they billed to the debtor under their "guideline hourly rates" for interim allowances during the case. (More about that missed "guideline" signpost later.) A total of 15,808 hours was expended by Stutman, Treister & Glatt in performing the services involved.

*First Boston Corporation,* for merger and acquisition ("M & A") services rendered under an engagement letter dated March 28, 1989, requests allowance of a transaction fee of $4,500,000 for such services. While technically not an "enhancement" but a separate application, this request is in effect an additional request over the $3,570,297.00 paid to First Boston Corporation for its services as financial advisor to the debtor under Court orders authorizing payment of flat monthly fixed fees for their retention.[4]

*Rothschild, Inc.,* as financial advisor to the Official Committee of Equity Security Holders, requests an enhancement of $1,000,000 over and above the $2,090,000 paid to them in fees under the orders authorizing their retention under fixed monthly fee payments. Those orders recognized that they reserved the right to claim an enhancement fee at the conclusion of the case.

*Paul L. Gioia,* as the Court-appointed examiner, requests an enhancement of $200,000 over and above the $268,875 previously allowed to him based on his hourly rates under the order authorizing his appointment.

*United Illuminating Company,* a regional utility company that was one of four outside utility companies that competed during the plan process for acquisition of the debtor, requests not an "enhancement" but a "benefit to the estate" allowance under § 503(b) of the Bankruptcy Code for its participation in that process to cover its costs and expenses in making its competing bid. While the rubric is different, some of the same "enhance-

ment" principles governing final fee awards in the bankruptcy courts apply and accordingly this request is also addressed in this Opinion.

Hearings on the foregoing applications were held on a number of dates: Gioia, September 27, 1991 (Transcript, Court Doc. 5795); Rothschild, Inc., January 13, 1992 (Transcript, Court Doc. 5863); United Illuminating, January 27, 1992 (Transcript, Court Doc. 5886); Stutman, Treister & Glatt, February 10 and 11, 1992 (Transcripts, Court Docs. 5907 and 5908); and First Boston, March 10 and 11, 1992 (Transcripts, Court Docs. 5911, 5912 and 5914). The Court deferred action on any enhancement requests, pending the completion of the hearings on all such requests, and directed further briefing by certain parties. All enhancement requests were considered ready for decision at the completion of briefing on May 12, 1992. The Court allowed an updating of case citations on July 15, 1993 and received a number of supplementary lists of case decisions by July 30, 1993.

■ As indicated above, the Court has had some difficulty in reviewing the record with any degree of continuity. Moreover, as noted at the outset of the case, see *In re PSNH,* 86 B.R. 7, at 11–12 (1988), it is very important that the bankruptcy court to make every effort to eliminate the "hindsight" factor when dealing with final fee awards in a reorganization case. As I noted there:

The regular hourly rates simply do not become *ipso facto* final fee awards in this court. Retention of attorneys at high hourly rates is based not only upon the assumption that attorneys billing at such rates have the necessary experience and competence to handle complex matters, but also upon the further assumption that attorneys billing at such high rates can normally perform their duties in fewer hours than less experienced attorneys who may bill at a lower rate. If that does not prove true with regard to the providing of

---

**4.** The issue joined in this regard, as will be developed later, is whether First Boston Corporation when donning its "M & A" hat, as opposed to its "F.A." hat, did in fact contribute any additional services that would justify a transac-

tion fee, as the case ultimately developed, in light of the termination of the debtor's exclusivity period and the filing and hearing of multiple competing plans of reorganization.

particular services in this case, the court will not feel compelled at the time of final fee awards to allow the full hourly rate for any such services. This is not to say that the court intends to employ a liberal dose of "hindsight" at the conclusion of the case, or to "second-guess" actions and decisions undertaken by attorneys in good faith as the situation appeared to them at the time such actions or decisions were necessary. Cf. *B & M Railroad Corporation v. Moore*, 776 F.2d 2, 8, 10, 54 B.R. [41], [47], [49] (1st Cir.1985).

The court is well aware of the uncertain world of fact and law in which the reorganization lawyer must dwell under the pressures of time and expense in moving forward with the formulation of a reorganization plan. It is a shadowy realm of incomplete facts and unformed legal issues that must be mastered quickly under manifold time pressures. What seems crystal clear and simple in hindsight when the reorganization is accomplished is seldom presented as such in the heat of battle.

Accordingly, it has been necessary to review essentially the entire record in this case from the outset in order to gauge the status of the proceeding at various dates "as it looked then" rather than as it may now appear in the memories of not only the parties but of the Court after the results were achieved.

## IV. FACTUAL CONTEXT: 1988–1990

Essentially this case was about what to do with a regulated utility company that was the lead joint owner (with ultimately a 36 percent share down from 50 percent originally) in developing and constructing the Seabrook, New Hampshire, nuclear power plant which originally was estimated to cost $1.3 billion for two reactors and ended up costing in excess of $6.6 billion for one reactor. The project was commenced in 1974 and originally scheduled Unit 1 for completion in November of 1979. Unit 1 was not actually completed until October of 1986. This was over a year prior to the commencement of this chapter 11 case in January of 1988 but the plant was not licensed to operate for various reasons until March of 1990.

The other joint owners ultimately had to accept substantial write-offs of their investments in the Seabrook Plant, pursuant to the requirements of their various regulatory rate proceedings, but none were forced into the bankruptcy courts in that regard. The distinctive problem that PSNH faced was that its capitalization was so low in relation to the magnitude of this investment (totalling approximately $2.7 billion dollars for its share) that it could not absorb a massive write-off without jeopardizing its capital structure, and accordingly it had to look for substantially increased rates to recover its investment.

It was quite expectable that PSNH would face fierce opposition from the New Hampshire regulatory authorities against any attempt to increase rates to the levels necessary to recover the Seabrook investment. The problem was exacerbated by the fact that the company had to resort to commercial borrowings at extremely high interest rates during the latter stages of the construction of Seabrook to achieve its completion. This created an active constituency of third mortgage bondholders who gave every sign of being willing to litigate to the end their rights to full payment of their bonds, including those high interest rates, before any lesser interests could be covered.

PSNH's problems were intensified by the enactment in May of 1979 of the so-called "anti-CWIP" legislation by the State of New Hampshire. This precluded any recovery of the costs associated with the Seabrook plant construction until the plant was licensed and in operation producing electricity to consumers. Notwithstanding that formidable roadblock, which was guaranteed to escalate the costs of construction by requisite borrowings due to PSNH's financial capitalization structure, PSNH management nevertheless determinedly plodded ahead to complete construction of Seabrook literally "at all costs".[5]

---

5. While it has been argued in various hearings in this case that the State of New Hampshire in effect gambled that the anti-CWIP laws would force PSNH to stop the Seabrook plant—which had engendering significant objections from en-

vironmental and other interests—and that PSNH having "won the gamble" was entitled to recover its full cost, that argument ignores the fact that under New Hampshire law the state has no say as to where and how a utility decides to build a

It will be useful at this point to set out briefly a chronology of the key dates involved in the progress of this reorganization case in this Court:

### 1988

On January 28, 1988, PSNH filed its voluntary chapter 11 reorganization petition in this Court. On June 22, 1988, the Court granted PSNH an extension of its exclusivity period to present a plan until December 31, 1988. On December 27, 1988, the debtor filed a plan of reorganization which proposed restructuring itself into wholesale and retail utility entities (i.e., the "FERC" plan) (Court Doc. 1529).

### 1989

On February 16, 1989, the Court entered an injunction preventing the New Hampshire Public Utility Commission from proceeding with a full-blown rate case against the debtor in Adversary Proceeding No. 89–006 (Adv. Court Doc. 65). On February 7, 1989, the debtor commenced a declaratory judgment proceeding, adversary proceeding no. 89–8, seeking a determination that § 1123 of the Bankruptcy Code had preemptive effect over conflicting state regulatory requirements. On March 16, 1989, this Court denied the debtor's request for further extension of exclusivity (Court Doc. 1896). On March 16, 1989, the Court also in its order denying extension of exclusivity provided for a 60–day moratorium precluding any plan proponent from proceeding with hearings on its disclosure statement during that period. On March 16, 1989, the Court also authorized the appointment of an examiner in these proceedings.

On May 16, 1989, the initial report of examiner was filed (Court Doc. 2161) and resulted in an order entered June 14, 1989 (Court Doc. 2256) directing a second report of the examiner and providing for an extension of the moratorium until the hearing on that second report on August 11, 1989. On August 14 and 18, 1989 the Court entered orders in response to the examiner's second report setting forth procedures for the filing and processing of competing multiple plans of reorganization with all such plans to be filed on or before September 15, 1989 and terminating the moratorium of the disclosure statement processing on that date (Court Docs. 2386 and 2400).

On September 15, 1989, five competing plans of reorganization were filed with the Court including a "stand-alone" second plan filed by the debtor which abandoned the "FERC plan" approach; on September 22, 1989 this Court announced its bench ruling sustaining the debtor's position in adversary number 89–8 that the provisions of § 1123 of the Bankruptcy Code preempted conflicting state regulatory law regarding the restructuring of a utility debtor in reorganization (Transcript, Court Doc. 2527, pp. 137–149); and from September through December 1989 various hearings were held upon disclosure statements relating to the competing plans of reorganization, as they were repeatedly modified and improved by their respective plan proponents, seeking support of their plan by the committees and the State of New Hampshire, with various hearings held before the Court during that period.[6] On November 18, 1989, the two official committees joined in support of the acquisition plan of reorganization put forward by Northeast Utilities incorporating a rate agreement acceptable to the State of New Hampshire.[7]

---

plant and always reserves the right to pass upon the wisdom of that decision (at the risk of the utility) if the plant is not shown to be "used and useful" at the rate level that would otherwise be required to recover the full cost of construction. See in this regard, *In re PSNH*, 114 B.R. 820, 833–842 (1990).

6. Transcripts of disclosure statement hearings appear in this record as Court Doc. No. 2798, October 27, 1989; Court Doc. No. 2887, November 13, 1989; Court Doc. No. 2898, November 14, 1989; Court Doc. No. 2961, November 15,

1989; Court Doc. No. 2971, November 16, 1989; Court Doc. No. 2972, November 17, 1989; Court Doc. No. 2888, November 20, 1989; Court Doc. No. 2920, November 30, 1989; Court Doc. No. 2922, December 1, 1989; Court Doc. No. 2947, December 2, 1989; and Court Doc. No. 3014, December 28, 1989.

7. New Hampshire Governor Gregg and the heads of the New Hampshire Senate and House had announced on November 15, 1989 a deadline by the end of the week for the committees to agree to back one of the three remaining plans

*1990*

On January 3, 1990, following the enactment of certain enabling legislation by the State of New Hampshire, the Court approved the final disclosure statement with regard to the Northeast Utilities' plan which by that time was joined in by other major parties in interest including the debtor (Court Doc. 3003). On April 20, 1990, after extensive evidentiary hearings, this Court entered an order confirming the aforesaid plan of reorganization (Court Doc. 3617). On May 16, 1991 the effective date of the plan occurred following the obtaining of various required regulatory approvals contemplated by the plan. On June 5, 1992 the ultimate merger of the reorganized company into Northeast Utilities occurred following certain additional required events.[8]

Due to the unprecedented nature of this case, and as an aid to any bankruptcy judge who subsequently may be unfortunate enough to encounter such a case, the Court throughout this proceeding has published its decisions to a greater extent than might otherwise have been appropriate. See, e.g., *In re PSNH*, 84 B.R. 1 (1988); 86 B.R. 7 (1988); 88 B.R. 518, 521, 546, 558, 563 (1988); 89 B.R. 1012, 1014 (1988); 91 B.R. 198 (1988); 93 B.R. 823 (1988); 94 B.R. 254 (1988); 98 B.R. 120 (1989); 99 B.R. 155, 177, 506, 510 (1989); 102 B.R. 276 (1989); 107 B.R. 441 (1989); 108 B.R. 854 (1989); 112 B.R. 49 (1990); 116 B.R. 344 (1990); 114 B.R. 800, 804, 813, 820 (1990); 116 B.R. 347 (1990); 129 B.R. 3 (1991); 138 B.R. 660 (1992); 148 B.R. 702 (1992). These opinions set forth in some detail the progress of the case in this Court and those details will not be repeated here but are simply incorporated by reference.

In particular, details as to the complexity of the case and the parties involved are set forth in *In re PSNH*, 88 B.R. 521 (1988) (dealing with exclusivity extension), and 88 B.R. 546 (1988) (dealing with intervenor and

parties-in-interest request). The history of the case during 1988 leading up to the filing of the debtor's first plan of reorganization at the end of the year is set forth in some detail *In re PSNH*, 99 B.R. 155 (1989) (denying the debtor further exclusivity extension). Pertinent detail is also included in the decisions *In re PSNH*, 99 B.R. 177 (1989) (appointment of examiner); *In re PSNH*, 108 B.R. 854 (1989) (preemption declaratory judgment); and *In re PSNH*, 114 B.R. 820 (1990) (plan confirmation).

Further factual details as needed will be set out in the discussion concerning each pending fee application. See Section VIII et seq., *infra.*

## V. LEGAL STANDARDS: THE LOGICAL PROBLEM

### *Applicable Law*

*a. The Statute*

The starting point for determining a reasonable attorney's fee award in a bankruptcy proceeding is 11 U.S.C. § 330(a). It provides:

§ 330. Compensation of officers.

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, *based on the nature, the extent, and the value of such services, the time spent on such services,* and the cost of comparable ser-

---

then pending (Northeast Utilities, United Illuminating and PSNH) for a PSNH reorganization or there would be no special legislative session before the end of the year—a session essential to implement the negotiated rate agreement. *Union Leader*, Manchester, New Hampshire, November 16 and 17, 1989. As indicated, the com-

mittees chose to go with the Northeast Utilities plan.

8. The fee applications presently pending all relate to services that were essentially complete by the time of the confirmation of the plan in April of 1990.

vices other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

(Emphasis supplied)

### b. The Supreme Court's Hybrid Approach

The Supreme Court discussed whether and when a court may enhance an attorney's fee award to reflect superior quality of representation in *Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) ("*Delaware Valley I* ").[9] The district court had granted "multipliers" of between 200 and 400 percent to the lodestar-determined fee for three different phases of the underlying litigation based on findings of contingency, i.e., risk of not being paid at all, superior quality of representation, and results obtained. *Delaware Valley I,* 478 U.S. at 554–555, 106 S.Ct. at 3092–3093.[10] Applying *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891

(1984), the Third Circuit upheld the multiplier enhancements, finding that the litigation was the "rare case ... and that the success was exceptional." *Id.* 478 U.S. at 556, 106 S.Ct. at 3094. The Supreme Court reversed, holding that the district court had erred in increasing the lodestar fee based on the claim of superior representation by counsel. *Id.* at 566, 106 S.Ct. at 3098.

*Delaware Valley I* recognized that, starting with *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court has been employing a "hybrid approach that share[s] elements of both *Johnson* [488 F.2d 714] and the lodestar method of calculation" in determining the reasonableness of attorney's fees. *Delaware Valley I* 478 U.S. at 564, 106 S.Ct. at 3097. Under this hybrid methodology, the Court first calculates a reasonable fee by the lodestar method and then considers other factors in deciding whether to adjust the lodestar determined fee upward or downward. *Dela-*

**9.** *Delaware Valley I* involved a fee application pursuant to 42 U.S.C. § 7604(d). Since the bulk of the Supreme Court's decisions discussing enhancement of attorney fee awards has developed in the context of the fee-shifting Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, the *Delaware Valley I* Court observed that "the purposes behind both [§ 7604d] and § 1988 are nearly identical, which lends credence to the idea that they should be interpreted in a similar manner." *Delaware Valley I* 478 U.S. at 559, 106 S.Ct. at 3095. Fee-shifting statutes like 42 U.S.C. § 1988 and 42 U.S.C. § 7604 allow a prevailing party to recover a reasonable attorney's fee as part of its costs. *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). The legislative policy underlying fee-shifting statutes is the desire to make it possible for "poor citizens with good claims to secure competent help." *Pennsylvania v. Delaware Valley Citizens' Council,* 483 U.S. 711, 730–31, 107 S.Ct. 3078, 3089, 97 L.Ed.2d 585 (1987). It should be noted that a fee award pursuant to either statute is directly to the plaintiff, not the attorney.

By judicial analogy 42 U.S.C. § 1988 case law has been brought to the bankruptcy arena since 11 U.S.C. § 330 also calls on the bankruptcy court to determine a "reasonable" fee award. *In re UNR Industries, Inc.,* 986 F.2d 207, 210 (7th Cir.1993). The parties in the present case have continued the analogy to 11 U.S.C. § 330, noting that its legislative history also evinces a congressional intention to make it possible for a debtor to secure competent bankruptcy counsel. But unlike the general civil practitioner who can

insulate from the risk of a downward adjustment to a billed fee through a separate retention agreement, the bankruptcy practitioner cannot do so since all fee awards are subject to bankruptcy court approval. 11 U.S.C. §§ 328, 330. Bankruptcy cases of course are not "fee-shifting" cases in the first place, i.e., the fee is not coming "out of the opponent's pocket" but rather from the client estate. Neither the Supreme Court nor the Court of Appeals for the First Circuit have ever discussed these differences in any detail relevant to the "enhancement" question. See, generally, *In re Apex Oil Co.,* 960 F.2d 728, 731–32 (8th Cir.1992); *In re Manoa Finance Co.,* 853 F.2d 687, 691 (9th Cir.1988) ("Despite these differences [with fee-shifting statutes] we conclude that § 330 and fee shifting statutes are sufficiently similar to justify applying the same general principles for fee enhancements."); *In re Casco Bay Lines, Inc.,* 25 B.R. 747 (1st Cir. BAP 1982) (applying *Furtado v. Bishop,* 635 F.2d 915 (1st Cir.1980), to a bankruptcy fee application).

**10.** While the phrase "quality of representation" is linguistically distinct from the phrase "results obtained," this Court considers them to be two sides of the same cause—effect relationship. See *In re Apex Oil Co.,* 960 F.2d 728, 732 n. 5 (8th Cir.1992) ("Arguably, the quality of representation and results obtained are a single factor rather than two separate factors because the quality of representation is often measured by the results achieved."). The First Circuit has recently joined the concepts as a single "Exceptional Performance/Results Enhancement" topic in *Lipsett v. Blanco,* 975 F.2d 934, 942 (1st Cir.1992).

*ware Valley I* 478 U.S. at 564, 106 S.Ct. at 3097.

Step one of the Court's hybrid methodology is the lodestar calculation. "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Delaware Valley I* 478 U.S. at 564, 106 S.Ct. at 3097 (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983)).

In step two, the trial court may modify the lodestar-determined fee, upward or downward, based on consideration of some or all of the twelve factors first announced in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). In *Johnson,* the Fifth Circuit developed the following twelve factors (the "*Johnson* factors") into a standard by which to determine the reasonableness of an attorney's fee award:

(1) the novelty and difficulty of the questions presented;

(2) the skill required to perform the legal services properly;

(3) the preclusion of other employment by the attorney due to acceptance of the case;

(4) the customary fee in the community;

(5) whether the fee is fixed or contingent;

(6) time limitations imposed by the client or circumstances;

(7) the experience, reputation and ability of the attorneys;

(8) the "undesirability" of the case;

(9) the nature and length of the professional relationship with the client;

(10) the time and labor required;

(11) the amount involved and the results obtained; and

(12) awards in similar cases.

The Supreme Court has applied the *Johnson* factors, either directly or indirectly, and either in whole or in part, in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), and both *Delaware Valley I and II.*[11] The trend since *Hensley* incorporated the *Johnson* factors by reference has been a whittling away of the *Johnson* factors as independent bases on which to justify an upward enhancement to a lodestar-determined fee.[12]

The *Delaware Valley I* Court described the decision in *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), as a "refinement" of its fee award standard. In *Blum,* the Court addressed the question of whether a 50 percent upward enhancement of a fee award was an abuse of discretion. On the ground that the fee applicant had not carried her burden of offering specific evidence justifying her entitlement to an upward adjustment, the Court reversed. *Blum* 465 U.S. at 902, 104 S.Ct. at 1550.[13]

The refinement identified by *Delaware Valley I* is *Blum*'s enunciated additional requirement before there could be an upward adjustment of a lodestar-determined fee award. *Blum* held that any upward modification to a lodestar-determined reasonable fee could only be countenanced in certain "rare" and "exceptional" cases. The Court framed its required additional findings thus: "An upward adjustment may be justified in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one

---

**11.** The First Circuit adopted the *Johnson* factors methodology in *King v. Greenblatt,* 560 F.2d 1024 (1st Cir.1977), then seemingly abandoned them in favor of the lodestar methodology in *Furtado v. Bishop,* 635 F.2d 915 (1st Cir.1980). *But Cf. In re Casco Bay Lines, Inc.,* 25 B.R. 747 (1st Cir. BAP 1982) ("In recognition of the deficiencies inherent in the *Johnson* approach but not in abrogation thereof, the 'lodestar' theory for fee setting developed.... in this Circuit in *Furtado v. Bishop* ... [T]he lodestar is an attempt to provide an analytical framework for the trial court's

application of the *Johnson/King* criteria."). The First Circuit BAP panel "suggest[ed] the bankruptcy judge should reserve such an adjustment [based on results obtained] until the lodestar is determined." *Casco Bay Lines,* 25 B.R. at 756; *see also In re D.C. Sullivan & Co.,* 69 B.R. 212, 216 (Bankr.D.Ma.1986) ("The lodestar method is still evolving.").

**12.** *See* discussion at subheading "f" *infra.*

**13.** *See* discussion at subheading "d" *infra.*

should reasonably expect in light of the hourly rates charged and that the success was exceptional." *Delaware Valley I* 478 U.S. at 566, 106 S.Ct. at 3099.

The *Blum* Court postulated that "[w]hen ... the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee...." *Blum* 465 U.S. at 897, 104 S.Ct. at 1548. This presumption rests on the reality that many of the *Johnson* factors are applied in determining the lodestar hourly rate. Specifically, the Court stated: "Because acknowledgment of the 'results obtained' generally will be subsumed within other factors used to calculate a reasonable fee, it normally should not provide an independent basis for increasing the fee award." *Blum* 465 U.S. at 900, 104 S.Ct. at 1549–50.

### c. The First Circuit cases

The First Circuit adopted the two-step lodestar approach to determining a reasonable attorney's fee award in a civil rights action in *Furtado v. Bishop*, 635 F.2d 915 (1st Cir.1980).[14] As already noted, the First Circuit Bankruptcy Appellate Panel extended the applicability of the *Furtado* standard to bankruptcy fee applications in the case of *In re Casco Bay Lines, Inc.*, 25 B.R. 747, 755 (1st Cir. BAP 1982); for a recent adoption, see *In re Saturley*, 131 B.R. 509, 521 (Bankr. D.Me.1991) ("First Circuit precedent embraces the lodestar approach to fee computations both within and without the bankruptcy context.").

But despite all the groping for a "useful analytical framework *that can be applied by trial courts in all cases*," 635 F.2d at 920 (emphasis added), even the issue of the applicability of the *Furtado* framework to bankruptcy fee applications has not been uniform. Compare *Boston & Maine Corporation v. Moore*, 776 F.2d 2, 6 (1st Cir.1985) ("The district court appropriately used the so-called 'lodestar' analysis to review the reasonableness of petitioner's charges, since Moore and his firm billed on an hourly time-charge basis, as they advised the B & M, at the outset, they would do") with *Boston & Maine Corporation v. Sheehan, Phinney, Bass & Green*, 778 F.2d 890, 894–95 (1st Cir.1985) ("While calculation of the lodestar is a useful, and often mandatory, starting point when the customary agreed-upon fee is based on an hourly charge, it is not the sole benchmark for measuring the reasonableness of any and all attorney fees, regardless of the 'mode and measure'").

While *Furtado, Moore,* and *Sheehan, Phinney* indicate the First Circuit's original willingness to go beyond a lodestar-determined fee award in certain circumstances, this Circuit's most recent restatement of its standard for enhancement of a lodestar-determined fee has predictably become more rigid in light of the intervening Supreme Court decisions. In *Lipsett v. Blanco*, 975 F.2d 934 (1st Cir.1992) the First Circuit ruled that the district judge had erred in enhancing a civil rights action attorney fee award by 50 percent above the lodestar. The district judge found the quality of services "extremely high" and found the "degree of success" to be "very great." The district judge also apparently allotted some portion of the enhancement for the risk of nonpayment. Enhancements for the risk of nonpayment, i.e., a contingency fee arrangement, are no longer permissible in fee-shifting cases. See *City of Burlington v. Dague*, —— U.S. ——, ——, 112 S.Ct. 2638, 2643, 120 L.Ed.2d 449 (1992).

The *Lipsett* panel took at least as stringent a view as the Supreme Court about the likelihood of a fee enhancement:

> *Exceptional Performance/Results Enhancement.*
>
> The Supreme Court has stated that, in some cases, the lodestar may not actually represent a reasonable attorney's fee, and thus, may require upward adjustment. See *Blum,* 465 U.S. at 897, 104 S.Ct. at 1548; *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. But, we have repeatedly cautioned that such enhancements will be rare. See, *e.g., Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 610 (1st Cir.1985). The exception is a tiny one—and we will not permit it to eclipse the rule.

**14.** *See* footnote 6 *supra.*

While some precedent holds out the possibility of enhancing the lodestar for exceptional performance and results, see, *e.g., Blum,* 465 U.S. at 896–901, 104 S.Ct. at 1547–1550; *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940; *Conservation Law Found. of N.E., Inc. v. Secretary of the Interior,* 790 F.2d 965, 971 (1st Cir.1986); *Wildman,* 771 F.2d at 610, more recent cases go a long way toward dampening this option. For example, in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), (*Delaware Valley I*), the Supreme Court counselled:

> Because considerations concerning the quality of a prevailing counsel's representation normally are reflected in the reasonable hourly rate, the overall performance ordinarily should not be used to adjust the lodestar, thus removing any danger of "double counting."

*Id.* at 566, 106 S.Ct. at 3098. In the same case, Justice White wrote that "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorneys' fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance." *Id.* Thereafter, we ventured to say that *Delaware Valley I* made "clear that adjustments are not to be given in reward for stellar performance." *Hall v. Ochs,* 817 F.2d 920, 929 (1st Cir.1987). *Lipsett,* 975 F.2d at 942.

Despite this parsimonious restatement about the possibility of an upward adjustment to a lodestar-determined fee, the First Circuit did recognize in *Lipsett* that the door to an upward enhancement of a lodestar-determined fee on the basis of "results obtained" is still slightly ajar:

> To be sure, both *Delaware Valley I* and *Hall* contain language intimating that there exists a strong presumption, not an outright ban, against exceptional performance/results enhancements. See *Delaware Valley I,* 478 U.S. at 566 [106 S.Ct. at 3099] ("Overall performance ordinarily should not be used to adjust the lodestar....") (emphasis supplied); *Hall,* 817

F.2d at 929 ("Exceptional performance is generally a function of the competence and experience that is reflected in the reasonable hourly rate....") (emphasis supplied). We have no occasion to probe these hypothetical possibilities today. Even if there may be some few cases where a combination of sterling performance and exceptional results could conceivably justify a premium fee, this case would not fulfill the necessary criteria.

In summarizing the "enhancement issues," the First Circuit said it was declining "the temptation to cart coal to New Castle." *Lipsett,* 975 F.2d at 943.

#### d. The required evidentiary showing

A mere unsubstantiated claim of superior quality or extraordinary results obtained will not do. The claim must be quantified in a manner that demonstrates through "specific evidence" why the lodestar-determined fee is not a reasonable fee award. *Delaware Valley I,* 478 U.S. at 567, 106 S.Ct. at 3099. As the *Delaware Valley I* Court stated:

> "Clearly, Delaware Valley was able to obtain counsel without any promise of reward for extraordinary performance. Furthermore, Delaware Valley presented no specific evidence as to what made the results it obtained during this phase so 'outstanding,' nor did it provide any indication that the lodestar figure for this portion of the case was far below awards made in similar cases where the court found equally superior quality of performance. Finally, neither the District Court nor the Court of Appeals made detailed findings as to why the lodestar amount was unreasonable, and in particular, as to why the quality of representation was not reflected in the product of the reasonable number of hours times the reasonable hourly rate. In the absence of such evidence and findings, we find no reason to increase the fee award in Phase V for the quality of representation."

*Delaware Valley I,* 478 U.S. at 567–68, 106 S.Ct. at 3099–3100; see also *Blum v. Stenson,* 465 U.S. 886, 901–02, 104 S.Ct. 1541, 1550.

In *In re UNR Industries,* 986 F.2d 207, 210–211 (7th Cir.1993), the Circuit Court affirmed the District Court's affirmance of the Bankruptcy Court's denial of debtor's counsel's request for an enhanced fee award based on quality of representation. The Seventh Circuit stated:

> [T]he decision denying Schwartz Cooper's request for fee enhancement rests squarely on a determination that, although the firm provided services of an extraordinarily high quality, that superior service was accounted for in the compensation it received at highly adequate hourly rates. The analysis does not flatly prohibit fee enhancements for quality; it merely presumes, in accord with the Supreme Court cases, that such enhancements are not proper when the compensation awarded is reasonable. We therefore agree with the district court that the bankruptcy court's legal analysis was appropriate.

\*　　\*　　\*　　\*　　\*　　\*

Schwartz Cooper fails to persuade us that these awards—which essentially represent the lodestar fee—do not fairly compensate for the work done or that they fall short of the compensation earned by attorneys providing comparable work outside the context of bankruptcy. See *Blum,* 465 U.S. at 899, 104 S.Ct. at 1549; *Manoa,* 853 F.2d at 688; *Apex,* 960 F.2d at 732. Schwartz Cooper did not present evidence, for example, that a transaction lawyer doing similar non-bankruptcy work would have earned a premium for such work. Moreover, "[t]here is nothing in either the plain language or legislative history of this provision ... that requires a bankruptcy court to identify specific non-bankruptcy services that are comparable to the service at issue before deciding whether a given fee, with or without an enhancement, is 'reasonable.'" *Apex,* 960 F.2d at 733 (not-

ing that the costs of comparable services is just one of a number of factors to consider in calculating reasonableness). The bankruptcy court was justified in denying an upward fee adjustment on grounds of quality.

Lastly, an enhancement should not transform a reasonable fee award into an excessive one.[15]

### e. Elmendorf

This Court considered the present issue in *In re Elmendorf Board Corporation,* 57 B.R. 580 (Bankr.D.N.H.1986). There I allowed a fee multiplier of 1.75 and 1.50 to the counsel for the trustee and the counsel for the creditors' committee respectively. The key factual findings in *Elmendorf,* 57 B.R. 580, justifying enhancement even in the face of the "rare" and "exceptional" requirements were:

> An involuntary petition was filed against the debtor on February 22, 1984. Thereafter the debtor on March 22, 1984 consented to the bankruptcy filing and filed its own voluntary Chapter 11 petition. The debtor corporation was engaged in the production of oriented strandboard, a new product developed under some German patents which seeks to use low-cost wood products to produce the functional equivalent to ordinary plywood. At the time this case was filed the debtor was losing approximately $100,000 a month in its operations. The debtor's plant and equipment were appraised at approximately $2,500,-000, with blanket liens against the plant and equipment covering a secured debt exceeding $30,000,000.

\*　　\*　　\*　　\*　　\*　　\*

A joint venture organized by the petitioning creditors and other parties did bring forward a plan in August of 1984 which would have paid administrative ex-

---

**15.** The Court notes that Rule 1.5 of the ABA Model Rules of Professional Conduct, adopted in the State of New Hampshire, requires that "[a] lawyer's fee be reasonable." Further, the ABA's Model Code of Professional Responsibility, DR 2–106, "Fees for Legal Services," cautions:

"(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee...."

Selected Statutes, Rules and Standards on the Legal Profession (West 1990).

penses and fees and would have provided some dividend to general creditors. Under the plan the ELV group would have funded up to $100,000 for fees and expenses of the trustee and his counsel, and up to $25,000 for fees and expenses of the creditors' committee counsel. An additional $400,000 would be provided for a dividend to general unsecured creditors.

While the ELV plan initially lists the unsecured creditor group as $1,644,300 in amount, the projected dividend would have been severely diluted if certain assumptions as to successful outcome of adversary positions (already taken by the trustee) were not borne out. Additional claims that could have ended up "sharing in the $400,-000 pot" included claims in excess of $2.6 million by the Swiss Bank Corporation, and a claim in excess of $7.0 million by General Electric Company for the contemplated rejection of a "tax lease" it had obtained from the debtor.

\* \* \* \* \* \*

The trustee and his counsel opposed the joint venture's plan of reorganization and ultimately were able to bring forward for confirmation on October 30, 1984 an auction sale of the plan and equipment under a ingenious series of settlement agreements with the various major contending interests. The settlements and sale made possible ultimately a reorganization plan confirmed on June 11, 1985 under which the trustee is presently completing the payment of all unsecured creditors in full.

The auction sale in October of 1984 resulted in a high bid of $5,150,000. This amount was augmented by $270,000 received from the sale of other assets and the net cash on hand from operations. In addition the trustee received $900,000 from the investors by virtue of various settlements, and $100,000 from a foreign investor group under a separate settlement, together with $30,000 in miscellaneous smaller settlements. The total funds thus generated, i.e., approximately $6,450,000, resulted under the various settlement agreements in a distribution of $4,775,000 to secured creditors, leaving approximately $1,675,000 for distributions to unsecured

creditors in various classifications and categories. The result has been that the general trade creditors in this estate are being paid in full by virtue of the foregoing, in a case in which at the outset it appeared that there was no prospect whatsoever for any sizeable dividend to general creditors. A small surplus remaining in the estate after the payment of all fees and expenses will go to the Swiss Bank Corporation, which has accepted a subordinated position with regard to its $2,600,000 claim.

\* \* \* \* \* \*

Under any measure this reorganization was successful far beyond any prospects for success that existed at the time the case was filed in February of 1984, and more importantly at the time the trustee was appointed in June of 1984. The attorneys were not only presented with complex and new issues including the "tax lease" device only recently enacted by Congress, and as yet untested in the bankruptcy arena, but the attorneys were under severe time pressure to master the facts involved and to attempt to get into a negotiating stance against some formidable national corporations and international adversaries.

It is also important to note in this case that the attorneys involved could have proceeded with the minimal plan offered by outside parties in August of 1984, under which their administrative fees and expenses at least would have been paid, but choose instead to wage a vigorous battle against various parties to force negotiation of a plan that ultimately resulted in full pay-out of all general creditors.

\* \* \* \* \* \*

In [this] case there was a clear and present danger, indeed a certainty, that counsel would be paid no fees whatsoever for their services unless they were successful in some manner in forging a successful reorganization. That in turn required dealing with assets subjected to a blanket lien more than ten times in excess of any then known values.

As indicated above, in the uncertain world of bankruptcy reorganization it is essential that the court and the parties be

served by attorneys who will put their compensation considerations aside when necessary to vigorously pursue the rights of the otherwise unrepresented creditors in appropriate litigation when there are valid causes of action to pursue. If such attorneys are to serve in that fashion they should in all equity be rewarded appropriately when they are successful.

*Elmendorf,* 57 B.R. at 581–83, 585–87.[16]

At the time of the *Elmendorf* decision, this Court first observed the dilemma it now faces again: "That the full 'twelve factors' approach cannot be implemented without excessively time-consuming and often overlapping analytical exercises of inappropriate 'hindsight' and 'second-guessing' ". *Elmendorf,* 57 B.R. at 586. It has been the experience of this Court in reviewing legions of fee awards that the reality of determining a reasonable attorney's fee departs from the beatific, but unfortunately protean, pronouncements of the higher courts.

### f. Quarrying the Analytical Quandary

In the first instance, the "rare" and "exceptional" standard is devoid of any analytical utility.[17] The Supreme Court itself has noted the nettlesome nature of its reasonable fee decisions. With respect to the *Johnson* factors, the Court wrote:

This mode of analysis, however, was not without its shortcomings. Its major fault was that it gave very little actual guidance to district courts. Setting attorney's fees by reference to a series of sometimes subjective factors place unlimited discretion in trial judges and produce disparate results.

*Delaware Valley I,* 478 U.S. at 563, 106 S.Ct. at 3097. The First Circuit Bankruptcy Appellate Panel in *In re Casco Bay Lines, Inc.,* 25 B.R. 747 (1st Cir. BAP 1982) noted the same: "This conceptual amalgam is so extensive and ponderous that it is probably not employed in any precise way by those courts espousing adherence to it." *Id* at 747, n. 15. Given the inherent subjectivity and practical problems in applying the *Johnson* factors, courts continued their "struggle[ ] to formulate the proper measure for determining the 'reasonableness' of a particular fee award." *Delaware Valley I* 478 U.S. at 562–62, 106 S.Ct. at 3097. The lodestar method was embraced as the solution to the shortcomings of the *Johnson* factors methodology.

But the fog that rolled in with the *Johnson* factors has not been dissipated by lodestar methodology. First, as the Supreme Court noted, "[a]llowing the courts to adjust the lodestar amount based on considerations of the 'riskiness' of a lawsuit and the 'quality of the attorney's work' [can] still produce inconsistent and arbitrary fee awards." *Delaware Valley I* 478 U.S. at 563, 106 S.Ct. at 3097. Secondly, lodestar methodology is not analytically self-contained. "The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward...." *Delaware Valley I* quoting *Eckerhart,* 461 U.S. at 434, 103 S.Ct. at 1940. This sounds like a re-application, or arguably the dreaded double-counting, of the *Johnson* factors to the lodestar-determined fee.

Since a "strong presumption" attaches to the lodestar-determined fee award as being

16. In *Elmendorf,* as noted, the Court alternatively held that the risk of nonpayment to the professionals involved also justified the fee multiplier. *Elmendorf,* 57 B.R. at 586. It is not yet clear whether the Supreme Court's disallowance of such enhancement in *City of Burlington v. Dague,* — U.S. —, —, 112 S.Ct. 2638, 2643, 120 L.Ed.2d 449 (1992), in a fee-shifting case, will be applied in bankruptcy cases. See careful reading of *City of Burlington* by the First Circuit in *Lipsett v. Blanco,* supra, at 943. See also the differing rationale for precluding consideration of risk of non-payment as a multiplier in fee-shifting cases, as compared to bankruptcy situations in which a contingent fee contract does not normally underlay the professional's retention.

17. Since "rare and exceptional" are comparative terms, the question arises: "rare and exceptional" as compared to what? For instance, as *Delaware Valley I* made its way up the appellate chain, the Circuit Judges disagreed among themselves as to whether the 4X multiplier used by the District Court was appropriate. Judge Becker wrote that "[e]ven assuming an award of quality and contingency multipliers is appropriate ..., the multipliers must be recalculated because the case was not *so very rare* as to justify in light of *Blum* the award of this extraordinary multiplier." 762 F.2d at 282, n. 12 (Becker, J., dissenting). (emphasis added).

the reasonable fee award in a particular case, *Delaware Valley I*, 478 U.S. at 565, 106 S.Ct. at 3098; *Lipsett*, 975 F.2d at 942, and because most typically the *Johnson* factors have already been "subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate," *Delaware Valley I*, 478 U.S. at 564, 106 S.Ct. at 3098, the question arises what, if anything, is left of *Blum*'s "rare" and "exceptional" refinement from an analytical standpoint? Can the trial court simply finesse the restriction by doing the enhancement by upping the reasonable hourly rates *before* releasing the lodestar figure? If the *Blum* refinement still functions, by what criteria is a fee-setting court to recognize a "rare" and "exceptional" case?[18] Finally, is it presumed that enhancements will be rare but downward adjustments will be common? Quo warranto?

### g. The Logical Problem

It is inherent in the concept of an "enhancement" or a "bonus" that there is some pre-determined "base figure" that has been fixed without need for any further adjustment. Yet the *Johnson* factors contain within themselves a number of the very adjustment factors which are often used to justify the enhancement requested.[19] This circularity can lead to double-counting if the logical problem presented for meaningful analysis is not directly confronted.

## VI. SYNTHESIS OF THE STANDARDS

■ In my view it is essential for clarity of thought and analysis in this area to abandon all talk of "premium" and "bonus" and the like and speak instead of the two-step process that inevitably and realistically must be pursued in the circumstances. First, the "objective lodestar amount" should be calculated by multiplying the reasonable number of hours found necessary to perform the services required by reasonable hourly rates *defined objectively as the attorney's existing regular hourly rates to the extent they are consistent with the prevailing rates for attorneys with comparable levels of experience in the relevant market place.*[20] Second, the Court can then consider whether the "value of such services" factor under § 330(a)(1) of the Code requires any upward or downward adjustment of this objectively-determined compensation level to provide "reasonable compensation" pursuant to the statute *based upon a specific showing by the party involved as to truly exceptional results in the particular case that would warrant such discretionary adjustment of the objective lodestar amount.*

The virtue of the foregoing formulation is to focus the "exceptional" test more precisely on the value of the services in the sense of the overall results in the specific circumstances of the case in question that arguably might justify some departure from an objectively-determined lodestar compensation level otherwise presumed to be reasonable. It eliminates any hidden double-counting and does not call for an unrealistic micro review of the hour-by-hour value divorced from the overall context.[21]

**18.** Certainly the higher courts cannot mean "rare" in the statistical sense, unless the goal is to transform trial courts into bureaus of statistics. Rather, "rare" must refer to the burden of proof an applicant must sustain before a fee-setting court may grant an upward enhancement of the lodestar-derived fee award. See subheading "d" *supra.*

**19.** In addition to the "skill" and "results" factors identified by the First Circuit in *Lipsett, supra*, the factors listed as (1), (6), (8) and (12) from *Johnson* at p. 413 of this Opinion also are often put forward as justifying a post-performance enhancement.

**20.** In a particular case it may be appropriate at the outset to provide that billings for the lodestar calculation be at a level below or above existing rates, in order to take into account certain of the *Johnson* factors that can be addressed at the time of the original retention. See footnote 21, *infra.*

**21.** It would make a good deal of sense to provide specifically *at the time of the original retention* of the professional that the *Johnson* factors listed on page 413 above, as paragraphs (1) through (9), be considered at the time of the original retention of the professional and be factored in then, if applicable, into the hourly rate that will be billed for interim compensation during the case, which will be deemed to be a "reasonable hourly rate" for purposes of determining the base objective lodestar level at the conclusion of the case. The factor listed as paragraph (10) would be reviewed at the conclusion of the case and would determine the "reasonable hours expended" which together with the reasonable hourly rate would produce the objective lodestar

The undersigned has come to this formulation after having struggled mightily to discern a principled basis for decision in actually granting or denying enhancement of fee awards in bankruptcy cases from the decided cases. That struggle unfortunately has not been able to get much beyond the "rare" and "exceptional" conceptual wall. With all due respect to my appellate superiors that standard simply does not decide actual cases. It does tell the applicant that he has a "strong" presumption to overcome but does not specify the degree or type of proof that is required to overcome the presumption in a particular case.[22] That is left to the discretion of the court. If that discretion is not to be unfettered, or is not to produce disparate results in appeals, there has to be some practical restraint other than "the length of the chancellor's foot."

The answer to this dilemma, I believe, can only be resolved by the formalized "process of decision" described above that demonstrates that the trial court starts with a relatively objective base level, considers any adjustment subject to the restraint intended by appellate case decisions, but also assures that the court is not at the same time excluding worthy cases for reasonable compensation by conclusionary labeling of an applicant's services as not "rare" or "exceptional." That process of decision on "enhancement

requests" I believe is true to the spirit of the pertinent appellate guidelines. In essence what the bankruptcy court must do in the last analysis is "tell the story" of the particular case, in a fact specific sense relevant to the value of services in question, and then express its conclusion as to whether the services were notably of value to the estate not fairly compensated by the objective lodestar fee level. See *In re Elmendorf, supra.*

■ In short, applicants for professional fee awards in bankruptcy cases can request an upward adjustment of the objective lodestar fee determination but must meet the burden of overcoming the presumption created by the appellate case decisions that the hourly rates of an experienced professional in the specialty involved should equate to a reasonable fee. Moreover, that burden is to be deemed stringent by virtue of those decisions. It can not be overcome by generalized rhetoric of "success" and "value" but only by a specific showing of exceptional activity *without which* the estate likely would not have achieved the results obtained by other specialists of like background and rates, or exceptional activity *beyond that* reasonably contemplated at the time of the original retention.[23] What facts are required for the "without which" portion of that showing necessarily will vary from case to case.[24] In

fee level calculation. The Court could then consider the factors listed under paragraphs (11) and (12) to determine any upward or downward adjustment of the lodestar level.

Any enhancement based upon exceptional value (beyond that subsumed within the other factors) conferred upon the estate would be subject to the restraint and guidelines established in that regard by the pertinent appellate case decisions. The net result of this process would be to produce a final fee award of "reasonable compensation" pursuant to § 330 of the Bankruptcy Code and arguably would do so in a more rational manner that would force a consideration of a number of the *Johnson* factors at the outset of the case rather than at the end. It would also eliminate the logical problems and possibility of double-counting that exists if the lodestar methodology and the enhancement guidelines are not synthesized coherently. Since the purpose of all these methodologies is to make sure that competent counsel are not deterred from appearing in bankruptcy cases, this procedural requirement for retention of professionals would force an "upfront" review and determination of what the market will require for retention of competent

counsel in the particular case—as to those factors that can be assessed at the outset. This Court may well implement these procedures for retention of counsel in future major reorganization cases by an appropriate Administrative Order.

22. A similar situation exists where the much-debated "clear and convincing" burden of proof in some civil case situations arguably leaves too much to trial court discretion.

23. It is recognized that these provisos impose a stiff test for fee enhancements and is not necessarily one that the undersigned would impose if writing on a blank slate. However, I believe it is required by the existing appellate case law in this Circuit if the standards specified are to be meaningful.

24. In *Elmendorf, supra,* although not reflected in the Opinion, the retention in question was earlier turned down by other professionals due to the apparently hopeless nature of the case. In the present case, two of the applicants have submitted the requisite proof and specific showing.

that context the bankruptcy court is entitled to receive from the applicant not a smoking gun but a "smoking silver platter" upon which the serving of the blessedly rare cut of economic nutrient for the estate is self-evident in all its steaming glory.

It is to that task that I now turn with regard to the pending applications.

### VII. WHO BROUGHT THE VALUE?

Common to all of the pending requests in one form or another is a contention that the applicants' services were significant in moving the value of this estate from the one-billion dollar range generally discussed at the time of the chapter 11 filing in January of 1988 to the $2.3 billion dollar value embodied in the confirmed plan of reorganization in April of 1990.[25]

A good deal of the swing in value had to do with the ultimate successful licensing of the Seabrook Nuclear Power Plant, which permitted it to come on line and start generating rates and recovery of costs. The initial uncertainty about Seabrook complicated the negotiation of a rate agreement but such an agreement, with alternative provisions depending on Seabrook, was in fact negotiated with the State of New Hampshire well before the licensing of Seabrook was a certainty. Also, during the process of reorganization, potential unsecured claims were reduced from over $5 billion to under $900 million. The secured debt at the time of filing was approximately $800 million and the asset values at that time, due to the Seabrook contingency situation, arguably were just barely sufficient to satisfy the secured debt.[26]

As a result of the successful reorganization and plan confirmation, full payment to all creditors was achieved, with unsecured creditors receiving the major portion of post-petition interest, and in excess of $500 million in value was left for equity security holders.

Thus, while the reorganization clearly was a success, considering the obstacles presented for resolution at the outset of the case, the question remains as to whether any of these applicants were the father, or the fathers, of that success to the degree necessary to entitle them to an enhancement of their fee compensation.

The Court has gone back through the entire record in that regard and it is apparent *from the earliest stages of this case* that all parties recognized that the three major obstacles that had to be overcome to permit a successful reorganization were (1) that the Seabrook Nuclear plant had to be licensed and be assured of going into commercial operation and the utility's ratebase; and (2) that a rate agreement had to be negotiated with the State of New Hampshire, if at all possible, to avoid lengthy and costly litigation concerning the conflict between chapter 11 reorganization provisions and state regulatory authority; and (3) since the debtor's weak capitalization might preclude a "stand-alone" plan the possibility of an acquisition by stronger utility had to be explored and preferably should be "harnessed" by appropriate procedures to maximize competitive bidding for such an acquisition.

With regard to the overcoming of these obstacles and requirements, the record is quite clear that none of these applicants had any significant direct function or activity with regard to the first or second of these matters. The licensing of Seabrook was conducted by a number of special counsel and other professionals appointed for that purpose who have been allowed their final fee awards for their services without request for any fee enhancement. The rate agreement negotiated with the State of New Hampshire was achieved primarily through the efforts of Northeast Utilities, the ultimate acquisition

---

**25.** Since United Illuminating has submitted its application only on the question of whether a losing bidder has a legally cognizable claim under 11 U.S.C. § 503(b), see Section XII *infra*, the present discussion as to causes of the increase in value during the reorganization is not relevant to, or binding upon, United Illuminating as to the question submitted for decision at this time on their application.

**26.** The Court did not need to address any valuation questions at the outset of the case but evidence presented at various hearings early in 1988 indicated values without the Seabrook Plant licensed and operating in the range of $800 million to $1 billion. Stock and bond prices at the filing date of January of 1988 indicated a total company value of $1.1 to $1.2 billion.

party, after a provocative report by the Examiner loosened up both Northeast Utilities and the State. While the various parties in the case had involvement in revising and improving the rate agreement after its initial announcement by Northeast Utilities and the State officials on July 27, 1989, no one party other than Northeast Utilities, directly, and the Examiner, indirectly, can be fairly said to have "achieved" the breakthrough with the State in that regard.[27]

The major factor accordingly which might support fee enhancement for these applicants devolves down to the third matter listed above, i.e., the nature, extent, and impact of their activities in terms of assuring that the acquisition process would be structured in such a way as to maximize the value to the estate should that process become the only feasible reorganization option. The crux of the case that each of these applicants must make to establish a claim for fee enhancement involves this key question.[28]

The year 1988 was taken up with the exploration of various options and the ultimate filing of the debtor's first "stand-alone" plan on December 27, 1988. The activities during that year leading to possible plan formulation are set forth in some detail in the decision in *In re PSNH*, 99 B.R. 155 (1989), denying any further exclusivity extension for the debtor. While that decision focused primarily on the debtor's activities during 1988, I do not find from the applications and the record that any of the other applicants achieved any notable successes during that year that could support an "exceptional" finding regarding their activity justifying fee enhancement.[29]

The crucial period in terms of activities that might justify fee enhancement in this case ran from January of 1989 through the end of November 1989 when the final plan put forth by Northeast Utilities was joined by the other parties-in-interest.

By the beginning of 1989 it had become obvious that an internal plan by the debtor-in-possession would be difficult to achieve, for various reasons, and that the plan process was going to be opened up to permit in effect acquisition bids to be submitted by interested regional utilities.[30] Considering the assets involved, and the degree of acquisition interest evidenced, it was important that the process that could lead to acquisition be structured in such fashion as to avoid having an acquisition of the debtor occur too early and at too low a value.

By the time the Court entered its Orders denying exclusivity and authorizing the appointment of an examiner on March 16, 1989, together with a moratorium on any competing plan proponent moving forward with disclosure statements and confirmation, see, *In re PSNH*, 99 B.R. 155 and *In re PSNH*, 99 B.R. 177 (1989), it was clear that there would

27. Indeed, the attorneys for the debtor concede that the debtor was never able to achieve a rate agreement with the State but argue that the debtor had too many "political problems" with State officials stemming from prior disputes regarding the Seabrook project to realistically have a chance to negotiate a rate agreement with the State by themselves. While that may be true, and the debtor's attorneys were accordingly hamstrung to some extent in that regard, the fact is that that obstacle was not overcome and therefore the rate agreement cannot be considered as a factor supporting a fee enhancement for the debtor's professionals. If they *had* achieved a rate agreement with the State in the face of those problems, that arguably would have been "exceptional" in nature sufficient to support fee enhancement under the appellate guidelines.

28. Certain of the applicants have other claims regarding specific value contributed to the estate by their activities which will be dealt with separately in the discussion of the specific applications below.

29. The debtor's attorneys contend that their involvement in a negotiation and settlement of the MMWEC matter and a related joint owners agreement was essential to any reorganization and should itself justify fee enhancement. That claim will be dealt with separately below.

30. Even before the filing of this case PSNH had been approached with acquisition inquiries. New England Electrical System (NEES) had indicated that it was interested in making an offer in the range of $1.1 billion to $1.3 billion. The record in this case also indicates that the debtor-in-possession was presented with numerous acquisition inquiries and data requests by various utilities including Northeast Utilities throughout 1988. The debtor did set up a data facility available to such utilities. There is some dispute as to whether the debtor was completely forthcoming in providing such data.

be a competitive bidding situation and that that process should be structured as efficiently as possible to assure that the maximum value be achieved for the estate from any successful acquisition party.

Reacting to the reports by the Examiner, and input from the various parties-in-interest, this Court entered a series of Orders which in effect established that bidding process under multiple plan procedural provisions that required all such plans in the "first wave" (which turned out to be the last wave as well) to proceed side-by-side on a disclosure statement hearing track, over the next several months, during which the competing plan proponents could increase the "bids" encompassed in their pending plans. The Orders in this regard, which are important to consider as to how and when the bidding process was structured, were entered commencing in March of 1989 and ending with the Order approving the disclosure statement with regard to the single joint plan that successfully survived that process. The Orders involved appear in the record as Court Document No. 1896, entered March 16, 1989; No. 1899, entered March 16, 1989; No. 2012A, entered April 3, 1989; No. 2127, entered April 28, 1989; No. 2155A, entered May 12, 1989; No. 2209, entered May 26, 1989; No. 2256, entered June 14, 1989; No. 2386, entered August 14, 1989; No. 2400, entered August 18, 1989; No. 2687, entered October 16, 1989; No. 2836, entered November 7, 1989; No. 2897, entered November 27, 1989; No. 2943 entered December 8, 1989; No. 2944, entered December 8, 1989; No. 2945, entered December 8, 1989; No. 2979, entered December 22, 1989; No. 3003, entered January 3, 1990; No. 3001, entered January 3, 1990.

The activities of the various parties with regard to devising the multiple plan procedures, and in evolving the various disclosure statements and plans, appear in the related hearings which also demonstrate the bidding process that took place. See Transcripts appearing as Court Documents 2029, March 28, 1989; No. 2232, May 26, 1989; No. 2391, August 11, 1989; No. 2409, August 18, 1989; No. 2428, August 25, 1989; No. 2527, September 22, 1989; No. 2693, October 13, 1989; No. 2798, October 27, 1989; No. 2887, November 13, 1989; No. 2898, November 14, 1989; No. 2961, November 15, 1989; No. 2971, November 16, 1989; No. 2972, November 17, 1989; Nos. 2887, 2888, November 20, 1989; No. 2920, November 30, 1989; No. 2922, December 1, 1989; No. 2947, December 2, 1989; and No. 3014, December 28, 1989.

A careful review of these Orders and these transcripts indicates what the undersigned recalled from memory but has now confirmed by review to avoid any "hindsight" distortion. No one party can claim that it structured the bidding process in a way to maximize values to this estate. The process evolved from interactions between all parties-in-interest and the Court, as the case progressed, with a need to devise some appropriate procedures once the debtor's exclusivity was terminated and multiple competing plan filings became a reality. Since everyone in a sense was responsible it cannot be concluded that the present applicants can claim special distinction in that area. Indeed, to the extent that the attorneys for the debtor and the debtor's investment banker were involved, it can be fairly stated that their involvement was essentially passive—due perhaps to the desire of their client in the first instance to prefer its own "stand-alone" plan of reorganization.

██ Accordingly, to the extent that any of these applicants claim entitlement to fee enhancement, or in the case of First Boston and Rothschild for separate or additional compensation, based on the increased value brought to this estate by virtue of the competitive "auction" that resulted during the multiple plan procedures in the fall of 1989, this Court concludes that there is no justification for a finding of exceptional activity by these applicants that would justify fee enhancement on that ground.[31] The amount of additional value brought to this estate in this reorganization essentially came from the multiple plan process described above and the synergies and values resulting from the

---

31. The special claim by the Examiner as to causing a loosening up of the process will be dealt with separately below.

acquisition and ultimate merger with Northeast Utilities under the surviving final plan.

To answer the question posed above, the Court concludes that *everybody involved* brought the increased value to the estate. Stated negatively, no one particular party brought the "swing in asset values" through any exceptional activity related to the auction of PSNH that occurred in this reorganization proceeding.

## VIII. STUTMAN, TREISTER & GLATT

As indicated above, the final fee application of Stutman, Treister & Glatt (hereinafter "ST & G") requests an award of $7,500,000 for their services in this case. This includes the sum of $4,344,707 which was billed to the debtor under their "guideline hourly rates" in interim allowances during the case. Based upon a total of 15,808 hours in services by ST & G, a fee award of $7,500,000 would work out to a blended hourly rate of $474 per hour. The blended hourly rate at the $4,344,707 level would be $275 per hour.[32]

Initially the only objections raised to the ST & G fee application were to the enhancement aspect, i.e., all parties agreed that a final fee award at the $4,344,707 level would be reasonable fee compensation. See Objections docketed as Court Doc. 5678 (Northeast Utilities); No. 5689 (State of New Hampshire); No. 5695 (Unsecured Creditors Committee); No. 5697 (Equity Committee); and No. 5727 (United States Trustee).

Thereafter, after discovery had indicated that ST & G's "guideline hourly rates" were not necessarily their "regular hourly rates" in common parlance, certain parties-in-interest filed amended objections objecting to any final fee award in excess of $3,676,343, which the objectors contend would be the total amount of fees allowable when calculated at ST & G's regular hourly rates. See Amend-

ed Objections docketed as Court Doc. 5869 (Northeast Utilities); No. 5870 (State of New Hampshire); and No. 5876 (Equity Committee).

The reason for this additional dispute, as reflected in the amended objections, stems from the fact that these objectors apparently for the first time became aware that the word "guideline" in ST & G's way of doing things was a noun rather than an adjective. ST & G in effect does not have regular hourly rates in any general sense but instead has multiple hourly fee schedules for its people that it uses for different types of cases. The record indicates that at the time in question ST & G had at least seven such different fee schedules for reorganization cases.

Regardless of the fact that the objectors may have missed the "guideline" signpost, the fact is that the Declaration of Richard Levin dated March 16, 1988 (Court Doc. 405, paragraph 14, page 9) clearly indicates that the guideline hourly rates may be higher or lower than rates charged in other cases by ST & G.[33] The Declaration clearly states:

> The guideline hourly rates on which the firm will base its compensation requests in this case, ranging from $80 to $375 per hour, are based, among other factors, on the size, complexity, expected difficulty, and time demands of this case, and on the fact that it will require the extended full-time absence of several lawyers from the firm's Los Angeles office. These rates are consistent with (and in some cases lower than) the guideline rates that the firm has used in other cases of similar complexity, scope, importance, commitments, and demands. They are higher than the guideline rates that the firm has used in cases that are smaller, less complex, less difficult, or less demanding or that do not

---

**32.** For comparative purposes the final fee awards as reflected in Annex A to this Opinion for the counsel to the two committees and two of the major other law firms serving the debtor-in-possession work out to blended hourly rates of $225 per hour for counsel to the unsecured creditors committee; $196 for counsel to the equity committee; $190 to Ropes & Gray, Esquires; and $194 per hour to Cahill, Gordon, & Reindel Esquires.

**33.** Mr. Levin might have been more forthcoming during the hearing on ST & G's retention when the discussion regarding the "guideline hourly rates" often devolved into discussion of "regular hourly rates" with no oral correction by Mr. Levin. However, all parties present were sophisticated professionals and had access to the pertinent pleadings defining the concept. See Transcript, Court Doc. 421, March 11, 1988, pp. 70, et seq.

require the same kind of experience, expertise, and commitment that a case such as this one requires.

Moreover, the rates on the guideline schedule submitted at the time of retention, ranging from $80 to $375 an hour, were known to all parties and no objection was raised as to their being excessive in the circumstances. ST & G billed throughout the 1988–1990 period of its services at the guideline rates which were not challenged by any party-in-interest. It would be inappropriate for this Court to now undo reliance by a professional upon Court Orders that authorized the professional to bill on a certain basis for lodestar calculation purposes.

■ Independently I would and do conclude that hourly rates in the range of $80 to $375 for ST & G services were in fact justifiable for billing purposes for calculating the lodestar fee level in the unique circumstances in this case even though divorced from what would commonly be considered market-based regular hourly fees. In essence what ST & G requested, and this Court approved, was the setting of a special rate of fees to take into account the complexity and uniqueness of this reorganization proceeding and particularly the fact that ST & G was drawn into the proceeding on short notice—with no fee retainer—when the debtor's prior attorneys were disqualified.[34]

Accordingly, to the extent that ST & G is entitled to fee compensation at the full lodestar level, calculated in terms of their hours of service multiplied by their guideline hourly rates billed throughout the case, I conclude that there is no basis for a downward adjustment of that amount. While their blended hourly rate of $275 per hour at the $4,344,707 level is considerably higher than the blended hourly rates of the other major professionals

servicing the debtor, see footnote 32 above, I believe that that differential is justified by the use of a small number of more senior attorneys by ST & G to deal with the complexity of this case.

The services of ST & G were provided in a professional and competent manner throughout the case as befitting reorganization professionals of considerable experience. They coordinated and used the services of other professionals when that procedure was more efficient and less costly to the estate. Just organizing and coordinating the activities of the various employees of the debtor and retained professionals with regard to reorganization and "non-reorganization" actions in a case of this magnitude required considerable skill and was performed well. They reacted promptly under considerable time pressures to the number of matters requiring response and action on behalf of the estate—particularly the attempt in the middle of the case by the New Hampshire Public Utility Commission to institute a "full-bore" rate proceeding that could have seriously disrupted the reorganization effort. In short, the services provided were professional and of the quality expected at the hourly rates billed and therefore there is no reason to adjust the lodestar-calculated fee level downward.[35]

Turning to the question of any increase in the final fee award over the lodestar level, ST & G makes two contentions that must be disposed of initially: (1) That their retention was not limited to the lodestar/enhancement methodology by virtue of their retention agreement with their client; and (2) That the lodestar/enhancement methodology itself is in conflict with the statute and that the "value" standard in § 330 of the Bankruptcy Code is the overriding controlling factor in determining reasonable fee awards. The

---

**34.** This approximates the upfront billing adjustment option to suit the particular case and circumstances which I have indicated above, at footnote 20, may be appropriate if raised at the outset and at the time of the original retention of the professionals involved. To the contention by the objectors that ST & G "helped itself" to a premium fee by this device the answer is that even if their retention were to be viewed in that fashion that simply raises higher the hurdle they must jump to establish entitlement to any fee above the lodestar level.

**35.** I am comforted in reaching this conclusion by noting that no party-in-interest—including the acquisition party—contended otherwise until the "guideline hourly rates" issue discussed above was raised. Moreover, this case by its nature had professionals having many years of wide and comprehensive experience in major reorganization cases in this country reacting to the fee requests.

short answer to these contentions is that they were in the wrong District for the first contention and in the wrong Circuit for the second contention.

■ This Court clearly rejected their attempt to condition their retention upon the retainer agreement and instead made explicit that their retention was upon a general retainer. See *In re PSNH*, 86 B.R. 7 (1988). In this District and Circuit that means an engagement on an hourly basis but subject to the lodestar methodology which may result in an upward or downward adjustment of the base lodestar-determined fee level to arrive at a final "reasonable" fee pursuant to § 330 of the Bankruptcy Code.

The Court specifically rejected an attempt by ST & G to have their retention approved on the basis of binding terms and conditions as set forth in the retainer agreement earlier negotiated with management of the debtor. See *In re PSNH, supra;* Transcript, Court Doc. 421, March 11, 1988, pp. 71–79, 86–87; Transcript, Court Doc. 519, April 8, 1988, pp. 68–77. These attorneys chose to continue their engagement notwithstanding that action by the Court and must be deemed to be bound by the terms of the engagement as finally approved by the Court.[36]

■ The contention by ST & G that the lodestar methodology and the "rare" and "exceptional" enhancement guidelines are inconsistent with the statute must also be rejected. In effect ST & G argues for a direct focus on the "value" standard in the statute to determine "reasonable compensation" thus neatly sidestepping the lodestar/enhancement methodology. While this methodology

in determining reasonable fee awards may have some logical flaws if not synthesized to an overall coherent methodology—as set forth in detail above—it *is* the governing law in this Circuit and this Court *did* make it clear that it would be employed with regard to awarding final fees in this case.

Aside from the fact that I am bound by those appellate decisions, I do not see in any event any irreconcilable conflict between this methodology and the statute. The appellate decisions stem from an important institutional interest in assuring "ready administrability" and the related interest in "avoiding burdensome satellite litigation" in federal court setting of fee awards, *City of Burlington,* —— U.S. at ——, 112 S.Ct. at 2643, so that the fee application "should not result in a second major litigation", *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941, and generally the avoiding of "an evidentiary nightmare" from a less formalized approach, *In re Apex Oil Company,* 960 F.2d 728, 732 (8th Cir.1992). The appellate Courts generally have been striving to provide as objective a fee determination basis as possible in their lodestar/enhancement methodology to avoid disparate results in the lower courts and to eliminate the disruption of ongoing judicial activity *as to current cases* if fee awards in prior cases are to become excessively time-consuming new lawsuits. The methodology is designed to allow market forces to determine an objective base fee level that will be presumed to be reasonable. The burden is then shifted upon the fee applicant to specifically demonstrate that the market was wrong in valuing the services in the particular case.

---

36. Nothing in this decision is meant to imply that in an appropriate case a professional about to be engaged in a reorganization case might not demand, and be authorized, retention on terms and conditions which would lead to calculating a final fee award differently than is done here on the basis of a general retainer. The difference of course would be that the conditions would be fixed *upfront* when both the Court and the parties could make a judgment as to whether retention *of that particular professional* on those specific conditions departing from general practice was justified on the facts of the case. Retention on a contingent fee basis where the estate has insufficient assets for litigation often provides such justification. Cf. *Boston & Maine v. Shee-*

*han, Phinney, Bass & Green,* 778 F.2d 890 (1st Cir.1985). Requiring such upfront activity also serves the basic underlying purpose of the changes that led to the enactment of § 330 of the 1978 Bankruptcy Code, i.e., assuring levels of compensation in bankruptcy cases that will not deter the obtaining of competent counsel in such cases. Competition for retention in major reorganization cases will soon determine whether competent counsel are unavailable to a debtor or a committee on a general retainer basis. If not, then special terms and conditions may well be authorized. However, if competent counsel *are* available on general retainer then the market has answered the "deterrence" concern.

Accordingly, this Court will and must review the request by ST & G for compensation above the lodestar level in terms of the prescribed methodology in this Circuit. The Court has earlier found that there is no basis for upward adjustment of the lodestar fee in terms of the swing in asset values resulting from the reorganization process per se. See Section VII above.

■ ST & G points additionally to its activity with regard to the MMWEC and related joint owners' settlement "as laying the groundwork" for any of the plans which were proposed in this case. It is correct that those settlements, initially negotiated in late 1988 and formally approved by Court Order on April 14, 1989 (Court Doc. 2069) were used as a working assumption by all plan proponents with regard to those matters. It is also true that the MMWEC settlement involved a $200,000,000 exposure that was reduced substantially by the settlement and that the joint owners prudency claims, if actually pursued aggressively, could have involved billions of dollars. ST & G was directly involved in negotiating both settlements although they did have the aid of other retained professionals in conjunction with those negotiations.

The exposures to the estate on these matters, while great in stated magnitude, in my judgment were never seriously a threat to these proceedings in the amounts claimed by these entities. There were exculpatory clauses that provided significant legal defenses and as a practical matter neither the Court nor the parties ever believed, with regard to the latter settlement, that the joint owners seriously would be interested in pursuing their prudency claims except as a defensive mechanism should the reorganization

of PSNH fail. It was not in the interest of the other joint owners to have a nonviable PSNH unable to contribute to the ongoing maintenance and cost of the Seabrook Nuclear Power plant. While there may be some degree of hindsight in these conclusions, it is my considered judgment that the negotiation of these settlements could and would very likely have been accomplished by other professionals of like experience and charging comparable hourly rates.

■ ST & G contends that their activity in devising the initial PSNH plan based upon federal preemption, see *In re PSNH*, 108 B.R. 854 (1989), and the obtaining of the injunction staying the New Hampshire PUC's attempted rate case, see *In re PSNH*, 98 B.R. 120 (1989), were essential to providing an "alternative option" that in effect kept both the State of New Hampshire and the outside acquisition parties honest in terms of negotiating a reasonable rate plan and reorganization plan. The record however indicates that none of the other major parties-in-interest took either the debtor's first stand-alone plan, or the second stand-alone plan filed in September of 1989, as a serious alternative once the debtor lost its exclusivity and the confidence of the two committees.[37]

The record is also clear that when the final multiple plan processes went forward, the other parties negotiated directly with the committees and left the debtor on the sideline. It is true that the committees occasionally brandished the club of the "preemption plan" in the face of the state negotiators and that to some extent the state negotiators had to take that alternative seriously. It is also true that the stopping of the new state rate case removed some leverage and bargaining power that the state might have exerted in

---

**37.** A rate plan unilaterally put forward by PSNH in April of 1989, without any prior input from the committees, had an enterprise value of between $1.8 and $1.9 billion dollars. The debtor's second stand-alone plan, filed on September 15, 1989, had a purported value of $2.2 billion but no substantial cash option at that time, but it was not so valued by the other parties because it had no such cash option at that time. It is essentially uncontroverted in this record that the debtor took no effective action after September of 1989 to move its plan forward toward increased values and did none of the negotiating and discussion

that would be expectable had they really believed they had a substantial chance of avoiding the takeover of the company under one of the acquisition plans. Indeed, the record will show that in September of 1989 the debtor's senior officials devoted considerable attention to improving their severance and related compensation benefit plans without requesting Court approval. The Court nevertheless insisted that the matter be heard in open Court—which resulted in a period of negotiating and bargaining before Northeast Utilities and other parties would agree to terms covering their departures.

the further plan negotiations. However, again, while ST & G showed considerable skill and ingenuity in developing the preemption alternative possibility, and in promptly and effectively responding to the state's attempt to initiate a new rate case, this Court cannot find that such skill and activity was beyond that expectable from attorneys with comparable experience and billing at comparable hourly rates.[38]

The Court concludes on a basis of review of the entire record relating to this application that a final fee award in the amount of $4,344,707 for services provided by ST & G in this case does provide reasonable compensation for those services under the applicable statutory and decisional guidelines and that ST & G has failed to meet its burden of showing any right to upward adjustment of this lodestar-derived fee level for exceptional results obtained from those services. As indicated above, to the extent that any enhancement might have been authorized over a lodestar determined by "regular hourly rates", these applicants in effect have already obtained some degree of enhancement by their retention on the "guideline hourly" basis.

## IX. FIRST BOSTON CORPORATION

First Boston Corporation requests a final fee award for their services as financial advisor to the debtor in the amount of $3,570,297 together with reimbursement of expenses in the amount of $224,094 (Court Doc. 5644). These are the amounts actually paid by the debtor during the case for the period of January 28, 1988 through May 1, 1990 under the retention Order entered March 21, 1988 providing for flat monthly fees for their financial advisor services. The Order provided for a review of the reasonableness of those amounts at the conclusion of the case and also provided that First Boston could request a success fee depending on the outcome of the case in excess of the flat amounts billed and paid.

Objections to the First Boston financial advisor fee request were filed by Northeast Utilities (Court Doc. 5679) and by the Equity Committee (Court Doc. 5698).

First Boston submitted an exhibit giving a reconstruction of the time spent on these services totalling 18,070 hours which would indicate a $197.58 per hour average hourly charge for the fee requested. First Boston has not requested any success fee for their financial advisor services. It would have done so had the debtor's plan of reorganization succeeded in reaching confirmation. The testimony to the contrary in this record, on the latter point I do not find credible, and is inconsistent with prior statements.

■ At the hearings on March 10 and 11, 1992, First Boston put in extensive testimony and exhibits detailing their financial advisor

---

**38.** ST & G makes a number of additional contentions which will not be detailed here since they again come within my general finding that at the rates being billed the services provided were in fact expectable and not extraordinary. One contention, i.e., that there was a risk of nonpayment in this case, is specious. There was no danger whatsoever that the hourly fees billed could not be paid by this estate and that I believe was apparent from the outset. Another contention by ST & G, i.e., that their request for the $7,500,000 fee was endorsed by management and the bankruptcy committee of the board of directors of PSNH, and by the full board of directors, at meetings in March of 1990, thus supporting the granting of the requested final fee award by this Court, has no weight in the particular circumstances of this case. Aside from the rather haphazard manner in which the presentation by ST & G was received I take note of the fact that the PSNH officials involved knew that they would shortly be replaced upon confirmation of the pending plan and in effect were "spending other people's money." They had already negotiated extensive and improved severance packages for themselves, together with comprehensive indemnification provisions, and it strains credulity to think that they would have scrutinized the fee request of ST & G with the same degree of care and concern that might have been appropriate had they not lost the company. [ST & G's proffered Exhibit No. 3, at the February 10, 1992 hearing, was a letter of March 1, 1990 to the CEO of PSNH, referring to the upcoming meetings to consider the fee request, and has attached thereto a ST & G summarization of the history of the reorganization case and ST & G's role for consideration by those officials. This Exhibit was marked for identification but may now be considered received in evidence to the extent that it details the presentation being made by ST & G to those officials. It is not received in evidence for the purpose of establishing the facts and characterizations therein included except to the extent those facts and characterizations are independently established by evidence of record.]

services in this case. These services included the normal professional services in analyzing the company's financial condition; preparing financial forecasts; assisting in valuation analysis and scenarios covering various options for internal reorganization and/or sale or liquidation alternatives; assisting in the development of a business plan, including appropriate internal structural reorganization, mergers, joint ventures or other sale or disposition of assets; analyzing and recommending an appropriate capital structure for the reorganized company under an internal reorganization plan; assisting in the negotiation and development of an internal reorganization plan; and generally organizing the data and flow of data requested not only by management of the debtor but also by other parties-in-interest at various stages in the case which was in fact quite time consuming by virtue of the complexity of the company and its regulatory environment. First Boston professionals involved in the financial advisor service included individuals having considerable experience in utility business operations and financial transactions and restructuring.

The objections to the First Boston financial advisor fee request in my judgment do not raise any serious questions with regard to the quality and extent of the manpower that First Boston devoted to the financial advisor services and stem rather from the frustration that Northeast Utilities experienced when First Boston deliberately slowed down the flow of information to Northeast Utilities until other potential bidders were in place (which was not entirely inappropriate at the earlier stages of this case) and from the exasperation felt by the equity holders due to First Boston's rebuffing of their attempts to have a distributive formula included in the solicitation of bids from outside acquisition parties (which was really a strategic decision by management) and do not support a finding by this Court that some portion of the flat fees as paid should be refunded by First Boston. On the contrary, I find and conclude that the flat fees as paid are in fact reasonable compensation under § 330 of the Bankruptcy Code.

To some extent the consternation of the objectors with regard to the financial advisor fees stems as well from the feeling that retentions on a flat monthly fee basis are not wise, throughout an extensive reorganization case, since the intensity of effort required by the financial advisor may well change dramatically as events unfold during the progress of the case. The Court itself shared this feeling toward the end of the case and expressed its own frustration in that regard on a number of occasions. However, at the time that this case was filed and the investment banker retention was authorized, it was a common practice in major chapter 11 reorganization cases to provide for retention of those professionals on flat monthly fee basis. The recent trend has been to the contrary. See, e.g., *In re Gillett Holdings, Inc.*, 137 B.R. 452, 454 (Bankr.D.Colo.1991) (on debtor-in-possession's application to employ investment bankers pursuant to a proposed fee agreement which debtor-in-possession argued was "standard for and customary in the industry", the Court held that the debtor could not employ the investment bankers on a monthly fee basis notwithstanding the "assertions that the terms and conditions are 'customary' in the investment banking business and in other similar Chapter 11 cases"); see also *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 26 (Bankr.S.D.N.Y. 1991). But I believe it would be inappropriate and unfair in effect to modify the terms of the retention of First Boston as financial advisor at the conclusion of the case by nit-picking their services hour-by-hour as though they had been retained on an hourly basis. To some extent the retention of an investment banker always requires some compensation on a fixed basis for simply "having them available" on call and on demand as analysis and valuations are required in the progress of the case. On that basis and after having reviewed the presentation made by First Boston with regard to their financial advisor services I believe that the objections put forward in that regard are not well-founded and are not sustained.

Both Northeast Utilities and the United States Trustee have raised questions about certain of the expenditures which have been reimbursed to First Boston for their

out-of-pocket costs during the course of providing services in this case. With regard to reimbursement of expenses, as contrasted with the allowance of interim fees during the course of this case, the Court has made it clear that unnecessary or inappropriate expenses should be objected to at the interim compensation stage and that the Court normally will not revisit those matters if they could have been raised at the earlier hearings. On that basis, and having reviewed the expenditures objected to, I do not find that any of these expenditures are so demonstrably excessive and outside the scope of First Boston's authorized activities as to force a refund of those reimbursements. The expenditures claimed therefore will be determined to be appropriately reimbursable as necessary and proper under the provisions of § 330 of the Bankruptcy Code.

 The more contentious issue with regard to First Boston revolves around their separate request for a "transaction fee" in the amount of $4,500,000 under their retention approved by Court Order on April 12, 1989 authorizing them to render merger and acquisition ("M & A") services to the debtor in this case (Court Doc. 5647). This Order came out of a hearing conducted on March 28, 1989 on the debtor's motion for that additional retention, (Transcript, Court Doc. 2029). The request for the transaction fee has prompted objections by Northeast Utilities (Court Doc. 5679); by the Unsecured Creditors Committee (Court Doc. 5696); by the Equity Committee (Court Doc. 5698); by the United States Trustee (Court Doc. 5718); and by the State of New Hampshire (Court Doc. 5687).

While the request for the transaction fee for M & A activities is separate from the financial advisor fee request, and therefore strictly speaking the M & A request by an investment banker in chapter 11 would normally not be considered an "enhancement" request, which was in a sense discussed in the preceding portions of this opinion, the particular facts of this case bring into play many of the same considerations that I have discussed above with regard to enhancement of fee awards in a bankruptcy proceeding.

At the time that First Boston was approved for M & A activities the Court had already on March 16, 1989 terminated the exclusivity of their client, the debtor-in-possession, and as it turned out First Boston became the exclusive agent for a sales transaction as to those parties who wished to deal with the debtor-in-possession. Nothing prevented other acquiring parties from acting directly with the committees and the State of New Hampshire in formulating their own plans for acquisition of the debtor and therefore it was apparent at the hearing on the retention of First Boston on March 28, 1989 that that possibility existed and that while First Boston was entitled to a transaction fee, in the event the company was sold, the magnitude of that fee would be particularly dependent upon any "added value" that First Boston could cause to be extracted from potential acquirers by an appropriate structuring of the "bidding process" in the multiple plan proceedings if the debtor and First Boston themselves were not able to arrange the acquisition through their own plan of reorganization. See Transcript, March 28, 1989 (Court Doc. 2029), pp. 16–17, 20, 23, 30–32, 37, 39, 49, 58, 61–62, 80, 86–94. The debtor and First Boston explicitly recognized subsequently the practical limitation in the circumstances of their "exclusive agent" status. See Transcript, Court Doc. 2232, May 26, 1989; Transcript, Court Doc. 2392, August 11, 1989,; and Transcript, Court Doc. 2409, August 18, 1989.

The sad fact for First Boston is that as the case unfolded from March 1989 through the end of the year no one ended up wanting to deal with the debtor with regard to the debtor's own plan. Some of the detail in that regard is set forth in the discussion with regard the ST & G fee requests above. Ultimately, nobody supported the debtor's plan other than management.[39] The fact that the debtor on December 13, 1989 joined in as a co-plan proponent on the Northeast Utilities plan, after both committees and the State

---

39. As Wilbur Ross for Rothschild, Inc., the financial advisor for the Equity Committee, testified at the hearing: "If the debtor was not comprised of the Equity Holders and the Unsecured Creditors I didn't know who they were".

had already embraced that plan, is not significant since the "case was essentially over" at that point as conceded by one of the First Boston witnesses.

In the situation following the termination of the debtor's exclusivity, while First Boston continued to insist to all comers somewhat haughtily that "we are in control", the fact was that neither they nor the debtor had much leverage left to force people to come with them and deal with them in the formulation of an acquisition plan. The debtor could not offer any added value through an internal plan, due to its weak financial structure, and did not have any credible "stand-alone" capability to refinance to provide a cash option plan to creditors.[40]

First Boston and the debtor might still have seized the initiative, notwithstanding the foregoing circumstances, had they indeed provided a structured bidding process and organized a united front of the debtor and the two committees on a proposed rate plan to put pressure on the State of New Hampshire to react finally to appropriate rates for the reorganized company. They did not however even test whether the State would come up on rates during that period and it was only at the end of July, when the Examiner was about to release his "2.2 Billion reasonable value" report and Northeast Utilities achieved a rate agreement with the State, that there was any movement in that regard.

Moreover, First Boston did nothing to present a formalized bidding process for consideration and approval by the Court that might have compelled the potential acquirers to come to a "Predator's Ball" hosted by the debtor in which the acquirers would have had to dance to the tune orchestrated by the debtor and its investment banker rather than the tune piped by Northeast Utilities after it had achieved its rate agreement with the State. Clear signals were given to First

Boston and the debtor that it was important to organize the "bidding process" in a way that would get the bidders to dance to the tune of the reorganization estate rather than the other way around (Transcript, Court Doc. 2232, May 26, 1989, pp. 65–67) and that it was important to try to harness the added value that outside acquisition parties might be able to bring to the reorganization estate entirely apart from the value coming from rate levels. (Transcript, Court Doc. 2232, May 26, 1989, pp. 44–46).

Both the Court and the other parties gave additional notice in the ongoing hearings before the multiple plan procedure orders were formulated that First Boston was expected to use its expertise to create as favorable a bidding process as possible to go along with the multiple plan procedures but that effort was not forthcoming for whatever reason. (Transcript, Court Doc. 2392, August 11, 1989, pp. 39–40; Transcript, Court Doc. 2392, August 11, 1989, pp. 65–67, 70; and Transcript, Court Doc. 2527, September 22, 1989, p. 92.

It is incredible to this Court that First Boston did not even see fit to attend the crucial hearing on August 11, 1989 when the multiple plan procedures and any related bidding process concerns were discussed. Essentially, the Court had to formulate as best it could a multiple plan process that would include the bidding process within the "first wave" multiple plan disclosure statement hearings. This process developed after the reaction to questions posited by the Court to the parties for consideration in the interim, in the plan procedural "Order Regarding Examiner's Second Report and Plan Procedures" entered August 18, 1989 (Court Doc. 2400) and the "Order Establishing Procedures for Hearing on Approval of Disclosure Statements and for Related Matters" entered September 26, 1989 (Court Doc.

---

**40.** The "last minute" purported commitment by FBC in that regard will be discussed below. Therefore, it is my judgment from this record that at sometime during the early summer of 1989 it had to have become apparent to both the debtor and FBC that their stand-alone plan could

serve only as a stalking horse to provide a benchmark or "floor" of sorts for comparison of the various acquisition bids that would come in under the other plans of reorganization. The increasingly passive activity of First Boston in that

2512).[41] With regard to the development of the "first wave" concept. See Transcript, Court Doc. 2392, August 11, 1989, p. 62; Transcript, Court Doc. 2409, August 18, 1989, p. 41.

This Court noted on May 26, 1989 at the hearing on the Examiner's first report that there was no apparent progress by First Boston in structuring the bidding process that had been the focal point and the primary emphasis of the March 28, 1989 hearing approving their retention for M & A activity. The Court there stated:

> [W]hat is preventing these consummate professionals at First Boston in dealing with this admittedly complex process in creating perhaps an imaginative structure for competitive bidding, either apples and apples or if it's going to be apples and oranges some kind of way to quickly analyze the difference between those two. It seems to me that there's got to be a way to create a bidding process even though it's an extremely complex case.
>
> Now maybe it's easy for me to say that, maybe it just can't be done that quickly but are they working on that? Is there some definite time when they will come up with the methodology of the bidding process to be tied in to any plan?

Transcript, Court Doc. 2232, May 26, 1989, pp. 65–66.

Despite that admonition on May 26, 1989 First Boston still took no significant action during the next two months to create a formalized bidding process. At the hearing held on August 11, 1989 on the Examiner's second report, the Court noted:

> THE COURT: Mr. Levin I have heard as many times as I want to hear the proposition that you can't create a bidding process because you don't know the rates. I think I said a year ago or 6 or 9 months ago that you can create a bidding process with alternative assumptions as to rates. You can create the process. It hasn't been done. I was astounded when I looked at

this record to find nothing that I could see happening except a letter that went out at the end of July and this business about we can't do anything, we can't get there from here because we don't know the rates, why do we retain professionals?

> If they can't work around problems like that, I don't understand what they are doing. If that's true, I shouldn't have been paying them flat fees for the last year and a half, I should have waited until we had a rate agreement and then bring these professionals in to create a bidding process.

Transcript, Court Doc. 2392, August 11, 1989, p. 88.

The Governor announced the agreement with Northeast Utilities on rates on July 27, 1989. On August 1, 1989 First Boston sent out letters to potential bidders requesting firm offers and that "all bids would be evaluated against a stand-alone plan of reorganization valued at not less than $2.2 billion." Court Doc. 2369, Exhibit i attached thereto.

There was no real question or need to identify and bring acquisition parties to the reorganization auction since it was apparent throughout that those parties would be other New England regional utilities and in fact they had all expressed interest from the earliest stages of the case. Accordingly, First Boston cannot claim with regard to its M & A activity that it in effect brought the bidders to the auction.

It is fair to conclude, as one of the witnesses testified, that during 1989, after the termination of the exclusivity, First Boston essentially represented the management of the company and did nothing significant with regard to achieving a rate agreement, did nothing significant in negotiating with the committees for a unified front against the State, did nothing significant to structure the bidding process, and finally did not create a level playing field in the multiple plan hear-

---

regard through the remainder of 1989 is silent testimony supporting this conclusion.

**41.** The Court even had to resort to the extraordinary action of spelling out for the parties its concerns about the unstructured "bidding pro-

cess" in the context of the multiple plan filings in an interim order entered August 14, 1989, between the hearings of August 11 and August 18, which noted these concerns as discussed above.

ing process to the extent that might have been possible.[42]

The debtor's stand-alone plan that was filed on September 15, 1989 along with the other plans, had a stated value of $2.2 billion but, as has been pointed out above, was overvalued in the absence of a viable cash option. The Equity Committee was "quite appalled" with that plan and was concerned that the debtor had not achieved a structured bidding process to avoid a "negative auction" in which the acquisition parties would compete in offering lower and lower rates to win the favor of the State of New Hampshire in backing their proposed acquisition plan. The Equity Committee made various overtures to the debtor and First Boston with regard to strategy in this regard but were rebuffed and accordingly resorted to a "self-help program" and started dealing directly with the other parties-in-interest.[43] As the plan hearings proceeded, both the Equity and Bondholder Committees abandoned the debtor's plan since it had a maximum value of $2 billion (or $2.2 billion if the debtor could find a cash option) and they had lost all confidence in the debtor's management.

In the September 1989 plan filings the "bids" incorporated therein had United Illuminating at approximately $2.2 billion; Northeast Utilities at approximately $1.9 billion; New England Electrical System at approximately $2.0 billion. In October Northeast Utilities increased the bid incorporated

in its plan to $2.25 billion. On November 13, 1989, United Illuminating filed an amended plan with a $2.290 billion stated value. On November 18, 1989, after the Governor had established his deadline for withdrawing the proffered rate agreement, Northeast Utilities submitted a final bid at approximately $2.3 billion which resulted in the joinder by the Committees and the State of New Hampshire and ultimately, on December 13, 1989, by the debtor itself.

First Boston contends that the debtor's stand-alone plan filed in September was "a real stalking horse" that provoked the increased bidding by the other parties since it provided a viable alternative to a simple acquisition of the company. During the hearings there was considerable discussion about the difference between a real stalking horse and a "straw stalking horse" but suffice it to say that while the analysis and data necessary to create the debtor's plan did serve as a benchmark reference point, no one seriously took it as a viable option because there was no financial capability to fund the plan's substantial cash option and the debtor had no other way to inject additional value or cash into the equation. The testimony is uniform that no other party-in-interest seriously considered the debtor's plan as anything more than a benchmark for reference purposes.[44]

Apart from the testimony of the other parties-in-interest, the lack of involvement of

**42.** The Court is aware of the complexities involving the structuring of bids in the utility situation in that each acquiring company has its own financial structure and rate base, etcetera, which to some extent will always require acquisition bids to be "apples and oranges" rather than "apples and apples" to some extent. However, we will never know how much additional value might have been extracted from the acquisition process had the debtor and FBC developed *as uniform as possible* common terms and conditions for acquisition that arguably might have favored the reorganization estate by forcing the acquisition parties to bid under terms that they themselves might not have considered the most favorable from their own standpoint but as to which they would have had to comply if they wanted to enter the bargaining and possible acquisition of PSNH. *That* type of structuring of a bidding process in this highly complex industry arguably would have been an exceptional achievement that clearly would have justified exceptional fees but it did not occur in this case

although the competitive bidding process and the plan hearings did in effect force some improvement in bids.

**43.** The value of the rate plan originally negotiated between Northeast Utilities and the governor, which was made available to the other plan proponents "on the courthouse steps" before the August 11, 1989 hearing, was not the same value in the debtor's stand-alone plan as it was in the Northeast Utilities' plan because the debtor could offer no new value being added in its plan for the reasons indicated above. Moreover, as will be discussed in Section XI below, certain undisclosed assumptions underlying the State–NU agreement had the effect of artificially depressing the enterprise value that could be extracted from the agreed rate increases.

**44.** In any event, development of an internal plan by the debtor is clearly covered by First Boston's agreement to provide financial advisor services.

First Boston in negotiations, meetings, and hearings which became increasingly obvious from the period from September to November of 1989 itself testifies to the lack of any serious clout behind the debtor's stand-alone plan. Indeed, First Boston did not even ask to attend the climatic all-day final negotiating session on Saturday, November 18, 1989. First Boston also began sending junior analysts and lesser employees to the various hearings and meetings.[45]

First Boston has asserted that in the M & A sales process the process "rarely includes a clearly defined bidding procedure" but this statement simply illustrates First Boston's inability to understand the uniqueness of their situation in this chapter 11 reorganization proceeding, with multiple plans as a reality, and with Court procedures and orders available to create such a bidding procedure. Whether an effort to utilize the power of the Court to create the procedure and to create effective deadlines would have been more successful in adding value to the reorganization estate or not is not the important question for present purposes. The question before this Court on their M & A fee request is what added value *they* created apart from the competition inherent in the multiple plans going forward.

The answer is that they did not take any special action to try to create a bidding procedure that would arguably have increased values, other than develop the debtor's second stand-alone plan, filed September 15, 1989, which provided a benchmark against which the third-party acquisition plans could be compared. Deposition of Arthur Reichstetter, Joint Exhibit 301, pp. 301, pp. 23–26, 29–36, 40–45. It is evident from this testimony and the entire record that First Boston simply did not agree—or did not understand—that a structured bidding process order was uniquely available from the bankruptcy court in this unique case and might have been used to better harness the competitive drive of the potential acquisition parties, i.e., to create "the box" for bidders that Mr. Reichstetter describes as the preferred tactic

in such situations outside of court proceedings and arguably to *keep* them in the box in this case notwithstanding the loss of exclusivity.

The Court itself noted at the August 11, 1989 hearing on the Examiner's second report that something had to be done to avoid a chaotic situation with multiple plans going forward with no formalized procedure understood by all parties. In reacting to the debtor's indication that First Boston would be proceeding with an undefined "bidding process" apart from the plan process the Court commented as follows in its Procedural Order (Court Doc. 2386) entered on August 14, 1989:

> My concern is that the concept of a "bidding process" proceeding side-by-side with plan filings contains within itself ambiguities that can lead to confusion and delay frustrating what I conceived to be the desire of most parties in interest—and certainly the present inclination of the court— that a meaningful set of procedural deadlines be established that will lead to a confirmation hearing late this year or early next year after a period of energetic competition by all competing plan proponents following a fair start.

> I had thought that the bidding process would have been structured before the August 11th hearing, and would have been presented to the court for approval and order advising all parties as to the terms and how the process would fit in with plan filing deadlines. [See Transcript C.P. No. 2029, pp. 87–92; these pages are also included in Annex to Order of April 11, 1989, C.P. No. 2052]. That has not occurred and it seems to me at present that this should be clarified in the order to be entered this week. Otherwise there is the clear prospect that some parties will hold back presenting substantial proposals by September 15th with the thought that an ongoing "bidding process" will cover them for future action.

---

**45.** The exhibits introduced by FBC to demonstrate its activity in structuring a bidding process demonstrate instead a rather superficial collection of materials with broad and obvious general categories and requirements but with no sophisticated detail that one would expect when dealing with sophisticated parties involved in a complex acquisition of a utility company.

At a minimum I believe it has to be made clear whether "bidders" must file their own plans of reorganization by September 15th and whether the "bidding process" after that date will consist only of the normal improvement in competing plans that can be expected to occur as the procedures and hearings in court approach the final confirmation hearing. My present inclination is that that should be so specified.

It is important as well to know not only "how much more" a competing outside bidding party is offering but also how the "additional value" generated by the bid (over book value) is allocated. The latter allocation factor may *necessarily* require the acquisition bid to be expressed in plan format, in order that it may be appropriately evaluated in the plan hearings and for ultimate plan confirmation purposes. Otherwise subsequent confusion and dispute in this area could make the "strict timetable" under the order the court is to enter this week nothing but an illusion.

It does not seem an inordinate burden on outside acquisition parties to structure their "bid" in plan format since they can incorporate distributive features of other plans that are suitable for their purposes. It will also emphasize that "bidders" who are not themselves parties in interest in the case have no standing to come in and disrupt the orderly progress toward a confirmable plan under a concept of a right to be heard because of an ongoing amorphous "bidding process" not structured and approved by order of the court.

I am aware that it can be counterproductive to the realization of maximum enterprise value to overly structure the plan hearing and confirmation process when there are competing plan proponents. However, I am also concerned that that process be as fair as possible to all parties in interest in the circumstances—and be perceived to be so. Moreover, considering the nineteen months that have elapsed since the commencement of this proceeding, I am especially concerned that all lurking ambiguities be removed from the process, and from my order, so that a true timetable leading to a confirmation hear-

ing—for those "fittest" enough to survive to that point—be established.

Accordingly, I will hold a brief hearing on *Friday, August 18, 1989*, at *9:30 a.m.*, to consider the proposed order or orders, and to hear any parties who have engaged in the drafting of same or who have submitted comments on the proposed order or orders.

On August 18, 1989 the Court entered its plan procedural order (Court Doc. 2400) which established the September 15, 1989 deadline for filing of plans and disclosure statements and September 22, 1989 as the hearing for establishing further procedures for the disclosure statement hearings. First Boston had nothing to do with fixing the September 15th deadline nor did it have any input into the terms of the order. The plan procedural order in paragraph 6 did authorize the debtor to fix a deadline earlier than September 15, 1989 for the submission to the debtor and First Boston of a bid for acquisition of the debtor which could be incorporated in the debtor's plan.

Notwithstanding this additional chance to negotiate bids into the debtor's plan nothing transpired and the record indicates that during the period of August 1989 through November 1989 First Boston did not have a single meeting or negotiating session with any bidder. It is also striking that First Boston never had a face to face meeting with Northeast Utilities or its representatives, and had very few meetings with the State of New Hampshire with regard to any rate agreement. During this period the Equity Committee negotiated a joint plan with Northeast Utilities which was filed on October 25, 1989, as indicated above, at a stated value of $2.25 billion. United Illuminating filed a joint plan with the Creditors Committee on November 13, 1989 which had a stated value of $2.290 billion. (Court Doc. Nos. 2740 and 2865)

On Monday, November 13, 1989 hearings on the amended plans and disclosure statements began. After the close of the hearings held on Wednesday, November 15, 1989 Governor Gregg met with the Committees and stated that they had 24 hours to reach an

agreement on one of the plans or he would withdraw the rate agreement. This deadline was ultimately extended to Saturday, November 18, 1989.

Earlier in the week, the United States Trustee had indicated that she would object to the debtor's plan and disclosure statement since there was no credible explanation as to what financing was available to support the cash option included in that plan. The United States Trustee made that objection at the November 14, 1989 hearing. On November 16, 1989 the First Boston Investment Committee met to discuss the status of the PSNH case and the possibility of underwriting a public offering of first mortgage bonds. This resulted in the issuance of a letter dated November 16, 1989 addressed to the vice-president and treasurer of PSNH stating the following:

> In its advisory capacity, First Boston has contributed to the development of the Company's Amended Plan of Reorganization dated October 25, 1989 (the "Amended Plan"). The following critical assumptions, among others, are necessary to the consummation of the Amended Plan:
>
> 1) New Hampshire State Legislature approval of a rate plan which includes seven annual rate increases of 5.5% beginning in 1990;
>
> 2) commercial operation of the Seabrook Nuclear Power Plant commencing on or before July 1, 1990; and
>
> 3) receipt of all necessary regulatory approvals prior to the Amended Plan being declared effective by the Bankruptcy Court.
>
> The Amended Plan contains an option to raise cash through the issuance of up to $1.5 billion of First Mortgage Bonds. Issuance of these bonds would be pursuant to a registered public offering of the bonds with appropriate terms and conditions. If the Company decides to proceed with a public offering of First Mortgage Bonds, and subject to the aforementioned assumptions and favorable market conditions, First Boston would be prepared to act as lead underwriter of such an issue.

First Boston contends that this letter was a "commitment letter" for funding of the debtor's stand-alone plan and that this not only answered the United States Trustee's objection but gave increased credibility to the debtor's plan. First Boston further argues that it was this action of theirs that stimulated the last increment of value by Northeast Utilities at the November 18th meeting in which it increased its bid the final $2.3 billion level. The record however does not support these assertions. In the first place the letter has obvious hedges and conditions and does not constitute a commitment letter in normal parlance in the investment banker industry. It is at most a business development letter.[46]

It is undisputed that following the negotiated deal between the Northeast Utilities, the Committees, and the State of New Hampshire, on November 18, 1989 neither the debtor nor First Boston took any actions to try to get additional value added to the plan as a condition to their joining the plan. It is also undisputed that when Wilbur Ross from the Equity Committee called representatives of First Boston during the next week expressing concern that the debtor hadn't joined in the plan he was told that there was still some issues involving severance pay and related matters to be resolved. Ross replied that if the deal blew he would recommend suing everybody in management.

The sum total of the record of this case and the hearings on the First Boston request

---

**46.** By contrast the commitment letter of Morgan Stanley, the investment bankers to Northeast Utilities, with regard to financing the NU plan, contains the "highly confident" words of art that telegraph a commitment in terms known to professionals in this area. Moreover, the other parties uniformly treated the letter as a non-event not only due to its late timing but due to its conditional nature. To some extent the final increment and value added by Northeast Utilities on November 18th was attributable to "bidding against the governors deadline" as much as reacting to any competing plan proposals. It is significant in this regard that FBC did not even attempt to take part in the final negotiating sessions with the Governor on November 18th and indeed had no one in Manchester on that day other than a very junior analyst who had joined FBC in September of 1989 and was "at the companies offices" while the crucial meetings were going on with the Governor.

for M & A transaction fee is that while First Boston was retained for M & A activity and was entitled to a transaction fee in the unusual circumstances of its retention, as described in detail above, First Boston was clearly on notice that a fee of any magnitude for such services would have to be earned by a demonstration of added value obtained by those services, apart from the increase in value of the estate that might obtain from the mere process of competition inherent in the multiple plan situation. On that basis, the Court finds and concludes that the only activity that could justify a transaction fee in this case in those circumstances is attributable to those services that were necessary to create the debtor's stand-alone plan as a benchmark for comparison with the acquisition plans and for those services it was bound to so act under its retention as a financial advisor.

As indicated above they have been awarded reasonable compensation for their services as financial advisor. I conclude that considering the unique situation surrounding their retention for M & A activity in this case, and their failure to so structure the on-going process from the point of their retention to force an injection of added value into the estate, First Boston is not entitled to a transaction fee on the particular facts of this case.[47] An M & A transaction fee is not earned simply by "Being There" in the sense of the recent Peter Sellers film. First Boston's purported M & A activity from the time of its retention in 1989 onwards essentially constituted that passive role in my judgment.[48]

## X. ROTHSCHILD, INC.

Rothschild, Inc., as financial advisor to the Equity Committee, has applied for a final fee award of $3,090,000, together with reimbursement of $204,663. in expenses. (Court Doc. 5655) The Court had previously on October 17, 1991 authorized a total of $2,090,000 in fees based upon the monthly flat fee amounts authorized under the Rothschild retention order, and confirmed the necessary and proper nature of the $204,663.11 in reimbursable expenses. Rothschild retention order of May 27, 1988 approved their retention upon an engagement agreement which specifically provided that they could apply for a success fee at the conclusion of the case in addition to the flat monthly payments but recognizing that the Court would "make the final determination whether Rothschild shall be awarded such additional fee" (Court Doc. 800). Accordingly, Rothschild's final fee request of $3,090,000 includes within it a request for a $1,000,000 enhancement over its base fee amount.

---

47. At the hearing FBC proffered testimony and exhibits with regard to fees paid to investment bankers and selected utility mergers and acquisitions (Exhibit 23 for identification) and M & A fees paid to investment bankers and various transactions (Exhibit 24 for identification, March 11, 1992). The Court received the testimony and exhibits subject to a motion to strike pending briefing of the legal question as to admissibility of those documents and that testimony in the post-trial memorandums. FBC has not addressed that in their post-trial memorandums. Northeast Utilities did address the issue in their post-trial memorandum, Court Doc. 5921, at pp. 47–48. After reviewing the record in this regard, the Court concludes that the proffered transactions purporting to be comparable services that would establish some reference point for fees in the present case have not been shown to be comparable to the present case in any material respect. Moreover to determine how comparable they were and what weight should be given to them would entail such detailed inquiry and extraneous issues and confusion that their relevance is outweighed by those considerations and

therefore I believe are properly excludable under Federal Rule of Evidence 403. A small sampling of the types of inquiry that would be required to determine whether these transactions were truly comparable is indicated in the discussion in the Northeast Utilities brief cited above. As was noted earlier in this opinion it has been held that § 330 of the Bankruptcy Code does not require bankruptcy courts to identify specific non-bankruptcy services that are comparable to the services performed by the fee applicant if that exercise would create an evidentiary nightmare. *In re Apex Oil Company*, 960 F.2d at 732. For all of these reasons the pending motion to strike is hereby granted with regard to the testimony involved with the referenced exhibits and those exhibits will remain marked only for identification and are not admitted into evidence.

48. The action of the board of directors of PSNH approving a $4.5 million fee for First Boston on M & A activity is of no weight and can be totally disregarded for the same reasons as indicated above with regard to the approval of the ST & G enhancement request.

438

Rothschild's original final fee application had requested a $2.2 million enhancement, which provoked objections by both the State of New Hampshire (Court Doc. 5688) and the United States Trustee (Court Doc. 5724). Before Northeast Utilities had to respond Rothschild lowered its enhancement request to the $1 million amount now before the Court and Northeast Utilities not only did not object but filed a statement in support of the application requesting that enhancement. (Court Doc. 5684).

After Rothschild had reduced its enhancement requests the Court gave both the State of New Hampshire and the United States Trustee time within which to file pleadings indicating their position with regard the reduced level of enhancement requested. The United States Trustee's Office did file a further amended objection in this regard (Court Doc. 5786) but the State of New Hampshire filed no further objection. Rothschild responded to the amended objection of the United States Trustee by a Reply Statement (Court Doc. 5809) filed thereafter.

The United States Trustee, both in its amended objection and in cross-examination at the hearing on January 13, 1992 on the Rothschild fee request, asked the cogent question as to what activity engaged in by Rothschild was beyond the normal scope and functions of a financial advisor in a chapter 11 reorganization proceeding. The United States Trustee also pursued the question as to why Rothschild should be singled out for special fee enhancement when the Unsecured Creditors Committee and the various bidders involved in the multiple plan process are either not claiming enhancement or are not entitled to the same. See also discussion in Section VII above re the increase in value due to the plan auction process.

Wilbur Ross was the lead investment banker who acted for Rothschild throughout the reorganization proceeding and testified at the January 13, 1992 hearing. (Transcript, Court Doc. 5863, January 13, 1992). Without restating in detail that testimony, and the cross-examination of Ross by the United States Trustee, the contention by Rothschild as to justification for enhancement of its base fee boils down to the following main points:

(1) the Equity Committee ended up negotiating for a plan in the crucial months of 1989 with the debtor essentially absent from the process; (2) the Equity Committee by default had to fill the vacuum left by the debtor and its investment banker in not performing the normal function of the debtor in coordinating and attempting to get a consensual plan negotiated with a unified front among as many of the constituencies involved as possible; (3) the debtor's loss of exclusivity and its passivity thereafter left the equity holders vulnerable to a "squeeze-play" between the State of New Hampshire, the outside bidders, and the Unsecured Creditors Committee, which could have resulted in nothing being left for the equity holders in a final acquisition plan and therefore required extraordinary efforts by the Equity Committee in this particular case; and (4) the Equity Committee with Rothschild's skilled help devised some unique securities for this reorganization which alone extracted another $55 million in value that cost nothing to the plan proponents having superior rights to the shareholders and otherwise would not have been available.

The United States Trustee's objection with regard to the nature of the activity of Rothschild, Inc., i.e., being nothing out of the ordinary in financial advisory services of an investment banker to an equity committee in a reorganization case, is well-founded. There is nothing in the testimony of Ross or in the extensive application filed on behalf of Rothschild, Inc. (Court Doc. 5655) which in topical terms would not come within the normal scope and duties of a financial advisor to an equity committee. Moreover, the complexity of the case and the successful results by themselves do not normally justify a premium fee as has been set out in some detail in the discussion of the applicable legal standards earlier in this opinion. It is true that the Equity Committee, and Rothschild as their financial advisor, had the responsibility for representing the interest of some 11,000 holders of preferred stock and some 45,000 holders of common stock and warrants. It is also true that from an original situation at the January 1988 filing date in which it was unclear as to whether anything would be left

for equity holders in the reorganization the Equity Committee was ultimately successful in negotiating a plan which provided in excess of $500 million in value to the shareholders.

There is no question that the plan was a success from the standpoint of the shareholders but it must be borne in mind that the original question about equity values largely revolved around the uncertainty as to the ultimate licensing and rate-producing value of the Seabrook nuclear plant. The value that came down to shareholders in the final plan was also a function of the multiple plan bidding process and additional value available from outside acquisition parties in that process which, as has been noted in Section VII above, is attributable to the general involvement of all parties in interest and therefore does not justify fee enhancement to any one party on that basis alone.

Nor can fee enhancement be justified for Rothschild, Inc. based upon their aid in negotiating the "give-ups" by senior constituencies which is quite common in negotiating consensual plans in chapter 11 cases. That is an essential part of the function of any equity committee and its financial advisor. Here the Equity Committee was able to negotiate a give-up of approximately $112,000,-000 in post-petition interest by the unsecured creditors that allowed additional value to come down to the shareholders. Wilbur Ross played that negotiating role well—stemming from his experience representing various parties in most of the major reorganization cases in this country in the past decade or more. Not only during the hearing on the Rothschild fee request, but throughout this case at various hearings, the Court noted from his testimony the qualities of a sharp bargainer and strategist who would and did keep his constituency "in the action" until the end. But again, this is what is expectable from professionals being compensated at the fee levels which were provided under the monthly flat fees for Rothschild in this case.[49]

Accordingly, if Rothschild is to be awarded an enhancement of its base fee in this case, under the applicable appellate guidelines detailed above, it must be justified on some basis beyond the mere showing that it performed its duties in a professional and competent manner and that the reorganization in a general sense was a successful and included the distribution of substantial value to the shareholder constituency. It is to Rothschild's contention in that regard that the Court now turns.

When Ross was being pressed in cross-examination by Mr. Gibson of the United States Trustee's Office regarding anything extraordinary in their activities he responded (Transcript, Court Doc. 5863, January 13, 1992, pp. 28–29) as follows:

Q. Mr. Ross, I don't mean to be simple minded with this next question but what did you perceive the duties of Rothschild to be when Rothschild was employed by the Equity Committee?

A. I think the duties that we had were the duties that are laid out in the Retention Agreement.

Q. Would you summarize for us what you thought those duties were?

A. Sure, to analyze the company, to advise the committee, to help the committee in its negotiations with other parties.

Q. What exactly is it about the services you have described in some detail that go beyond that scope?

A. Oh, what goes beyond the scope is literally us being the intermediary between, if you will, the company and the potential bidders. Normally, what would happen, as I tried to describe in summary, is the initiative normally would be taken by the debtor and by its

---

49. Ross contended at the hearing that since Rothschild agreed to a lower flat monthly fee than the other investment bankers involved in the case Rothschild's request for an enhancement should be viewed differently. However, the record indicates that unlike the other investment bankers Rothschild did not itself have extensive utility engineering and technical capability within its own organization. Rothschild accordingly had to have the Equity Committee retain separate R.J. Rudden & Associates to provide that expertise. R.J. Rudden & Associates as indicated in the Annex to this opinion received some $523,-841.25 in compensation for their services to the Equity Committee.

advisors, there would generally be a deal announced among those parties and at that point, then the Equity Committee would get to try to reset its part of the deal or renegotiate.

What is quite without parallel as far as I know is the idea that the Equity Committee would have first made a deal with an acquirer and then the creditor constituency gradually coming on board with the Equity Committee actually helping in the negotiations to get those creditor constituencies on board and with the debtor absent from the process. That is one of the things to me that's without parallel.

The Court itself pressed Ross with various questions at the conclusion of his testimony (Transcript, Court Doc. 5863, January 13, 1992, pp. 46–52) probing what if anything was extraordinary in the activities of Rothschild as a financial advisor to the Equity Committee:

Q. Mr. Ross, your testimony may be characterized as, I believe, or suggesting that the Equity Committee when appointed in a Chapter 11 reorganization looks at the case and if it doesn't appear there is any value under normal accounting standards or something, that you fold up your tent and go away, is that the way you operation in a major cases?

A. No, Your Honor, and if that's the impression I gave, I didn't mean to.

Q. The reason I put the question is a lot of your description of your services deals with trying to get some value down to equity which I take it to be the heart of your service to any Equity Committee and that's often done by negotiating rather than litigating, getting give-ups by the people higher than you that, strictly speaking, might not prevail in litigation and in negotiation, the values are uncertain and there is room for compromise there. Is that what equity committees do?

A. Negotiations, Your Honor, are certainly part of any big complex case, what I think was different here is that normally there is a framing of reference, if you will, a mediation and honest broker

things that are provided by the debtor, that did not occur here.

Second, it normally is the case, at least in our experience, that where there is an M & A process, it normally is a relatively orderly and stylized process with a fairly normalistic means by which the committee advisors interact with the debtor's and investment advisors. That also didn't occur here, so the basic structural elements that normally are present simply were not present here. To make the contrast, if I may, we are in a case that is more or less like the Allis Chalmers which also ended up in the sale of the whole company.

In that case, it ended up being sold in a bunch of pieces rather than in one lump as was the case here. There, the debtor's investment banker very much had control of the process. We had very specific interactions with them and there was a great limit even how much we were able to disclose to our own constituents or any in-state committee constituents, so it is a much more normal process and we had set a pre-agreed upset price for each of the divisions and we had pretty well worked out how the proceeds would be allocated at a base level of sale price and how the increments would be allocated, so the negotiating was done beforehand.

As the Court may recall, part of the reason that we and our committee opposed a lot of the retention applications that the debtor has made, I guess on several occasions relative to First Boston was that we disagreed with the way they intended to approach the M & A process, we disagreed with the framework, we disagreed with what should be the beginning predicate of it, so that's what made it very unusual, not that there was an M & A process and not that we would have a level of involvement, what is unique is that we had a primary level of involvement rather than a secondary level and that the debtor and its advisor had kind of a trivial involvement.

Q. What did you think was unusual about the earlier effort of the debtor and First Boston to go forward with the M & A process?

A. Well, the following were unusual: I felt that it was hurtful to the M & A process not to have first made a rate agreement with the State or at least not to have a rate agreement agreed among the Chapter 11 constituents other than the State which would be the required predicate for a bid. We felt that any effort to commingle the rate negotiations effort with the M & A process would invite potential bidders to state their lowest rates first wooing the constituents to a higher price, so we totally disagreed with the idea of marketing the company in the absence of some agreement among some sort of constituencies on rate structure.

The second thing that we disagreed with was we felt that it was inappropriate not to set a base price below which no bid would be accepted, pretty much the same reason. It's been our experience that when you have an uncontrolled M & A process, you can end up with quite horrific results, particularly when the bidders have to take on the vagaries of a very complex Chapter 11 and the whole regulatory panorama with the State, so we felt that you're inventing the whole deal which results in a lower reorganization.

Q. What was it that the debtor and First Boston were proposing in that regard?

A. Well, what they proposed and what they did is they put together a Data Room.

Q. You referred to, I think you said an upset bid?

A. They never set an upset bid.

Q. In your view, there should have been one?

A. There very definitely should have been, they did not. We felt that there should be a pre-agreed split of the proceeds both at the upset price and for any increments above it, a 3–way split between the creditors, the constituents and the equity so that a bidder would only have to do one thing, come with the most value and not get involved with intramural wrangling because it's been our experience that particularly bidders who don't have a great experience with the Chapter 11 process, they might be uncertain at the wrangling, the professional fees that they run up in great amounts before they finish, they have a deal. It's our position that the easier you make life for a bidder the better.

The second thing that we felt was it should be announced as part of the Court-approved bidding process that there would be a specified breakup fee followed by bid increments so that there would be an incentive for a party to come with the highest bid in the private auction process and, therefore, make sure we had the best possible bid when we got to open court for the possible second round of bidding.

The way they went about it, in our view, had the potential for making people leave something in reserve and, therefore, we had to take our chances as to every mystery bidder or second bidding in the room so the level, the number of areas on which we disagreed with them were quite considerable and I think quite fundamental to the process and, frankly, even though we are happy with the end result, I do believe it would have been a better process had it been properly structured and in a more orderly fashion.

An independent review of the record of this case establishes that the vacuum that Ross describes did occur due to the passivity of the debtor and First Boston with regard to getting control of the sale option for a reorganization plan.

Indeed, Rothschild initiated the first meeting with the State of New Hampshire and other parties on June 17, 1988 to discuss plan and rate options, and followed up in meetings in June and July 1988 with preliminary outlines of reorganization plan proposals that for the first time forced the State to react as to specific concepts in the proposals. The Court has previously commented on the sur-

prising lack of direct negotiations by the debtor with the State of New Hampshire on rates during 1988. See *In re PSNH*, 99 B.R. 155, 172–175 (1989). The debtor and its investment banker also pursued a curious pattern of making unilateral proposals to the State, when it did approach the State on rates. In early December of 1988 the debtor indicated that it would be making a counterproposal to the State showing a rate increase of some 31 percent without prior consultation with the committees. In April of 1989 the debtor and its investment banker again approached the State unilaterally, to the consternation of both committees, with a rate proposal that carried an enterprise value of $1.9 billion. The debtor then had to back off somewhat red-faced because in effect they had got ahead of their constituencies. This episode destroyed whatever credibility the debtor and its investment banker retained vis-a-vis the State of New Hampshire.

As early as August 11, 1989 both the Court and the other parties noted that the debtor and First Boston had gotten into the structuring of the bidding process at the last minute with their sketchy August 1, 1989 letter soliciting bids and all parties regarded that effort as too little and too late. (Transcript, Court Doc. 2392, August 11, 1989, pp. 40, 78, 81–84). It was also noted as discussed above that the status of First Boston as "exclusive agent" always was subject to qualification regarding competing plans once exclusivity terminated and that First Boston would act as agent for the sale only if an acquisition party elected to go forward with the debtor. (Transcript, Court Doc. 2392, August 11, 1989, pp. 86–96).

As has been set forth in detail earlier in this opinion, the default by the debtor and its investment banker to structure the bidding process led to the fashioning of such a process with the input of all parties involved in

the series of hearings commencing in August of 1989.[50] Whether or not the sale process that Ross envisioned, with the upset price and other features described above, would have produced substantially greater value may be debatable but what is not debatable is that there was a real vacuum caused by the inaction by the debtor and its investment banker which exposed the shareholders to various dangers in the ongoing multiple plan process that required extraordinary efforts on the part of the Equity Committee to defend itself with no help from the debtor.

How Rothschild aided the Equity Committee in avoiding the "cramdown" danger posed by the failure of the debtor to remain a viable plan proponent is set forth in detail in paragraphs 94 through 110 of Rothschild's fee application (Court Doc. 5655) which Ross incorporated into his testimony at the January 13, 1992 hearing.[51] This recitation accurately sets out the substance of Rothschild's role during the crucial months of October and November 1989 when, as has been detailed earlier, the debtor and its investment banker did their Cheshire Cat disappearing act. This testimony is corroborated by all the other parties in interest other than the debtor and First Boston.

The startling absence of the debtor and its investment banker from the crucial final negotiating session for a consensual plan on Saturday, November 18, 1989, is detailed by Ross in his testimony as follows:

Q. Now, there came a time, did there not, when Governor Gregg, for whatever reason, set an absolute deadline?

A. He did indeed.

Q. And that was that weekend that you described in your opening statement?

A. Yes.

---

**50.** Notwithstanding the termination of exclusivity on March 22, 1989 the debtor and First Boston still had the power to seek a Court order establishing the process as a result of the approval of the retention of First Boston for merger and acquisition activity as a result of the March 28, 1989 hearing. The Court attempted to give them that leverage and clout by its findings and conclusions incorporated into that order but they again remained passive until Northeast Utilities

reached the first rate agreement with the State of New Hampshire at the end of July, 1989 and the examiner had filed his report of at the same time indicating that a value of $2.2 billion should be attainable. See discussion above.

**51.** See Transcript, Court Doc. 5863, January 13, 1992, p. 32.

Q. And at that time, I believe you said there were negotiations that included the unsecured creditors?

A. Yes, sir.

Q. And did you act as a go-between or a broker on those?

A. Yes, sir.

Q. And who were you brokering between?

A. In a sense, between the Equity and NU on one hand and the Unsecured Creditors on the other hand.

Q. And I think you stated that the debtor sort of supplied the hall, is that correct?

A. Only the very last day, the Saturday that we were up here. The prior discussions that we had had, in one case, the meeting was held on a Saturday at the office of Morgan Stanley, in my office, at Whitman Ransom, it was just the very last day that the debtor since we were up all up in New Hampshire because we had to be here for the governor, it happened the debtor was the landlord.

Q. And the governor had set 5:00 o'clock on this Saturday, there had to be a deal or something bad was going to happen?

A. Yes, I think he might originally have said 4:00 o'clock and then during the course of the day at request of, I think, ourselves and NU extended it to 5:00 o'clock.

Q. The NU people with the Morgan Stanley people and their lawyers and their business executives were over at the NU office on Elm Street?

A. That's correct.

Q. And who were you with?

A. Well, we started out the day at PSNH with the Unsecureds and the PSNH management. We were trying to get the Unsecureds at that early part of the morning to sit with us and with NU and to try to work out a deal. At that point, they were not willing to do so, and there was also present there United Illuminating who were still trying to make a proposal so we also met with them. We then went back to NU's office, mainly operated out of there, started making phone calls back into the Unsecureds as

we had some progress; we had one little session with United Illuminating where we told them that we really didn't see their proposal going anywhere and then subsequently got the Unsecureds to agree to let NU and ourselves come over and talk with them, and this was that last session that led to the deal.

Q. And that was well into the afternoon, was it?

A. Yes, that was at least 4:00 o'clock in the afternoon and, in fact, the governor first postponed it from 4:00 to 5:00 and 5:00 to 6:00 and maybe until 7:00.

Q. The governor was off at the Cape or perhaps in the office.

A. I don't know here he was. He was not on-site, we eventually met with him at the Devine and Millimet law firm.

Q. And your negotiating team included yourself and your colleagues with Rothschild, your chairman and Mr. Berman?

A. Howard Berman, yes, and also Mr. Tilton, Rick Tilton.

Q. And who were you representing? With who were you negotiating with on behalf of the Creditors Committee?

A. Who were the main parties?

Q. Yes.

A. It was sometimes James Neidhart what was the chair of the committee, and sometimes the various parties from Salomon Brothers.

Q. And Mr. Kalmus was there, I take it?

A. And Jeff Kalmus.

Q. And this last negotiation or last session that took place that started around 4:00 o'clock, where did that take place?

A. That took place on the premises of PSNH.

Q. And were the PSNH people involved in these discussions?

A. No, they were not, they were in other offices in the building but they were not in the meeting room with us.

Q. And what happened, why don't you tell the Court what happened in that last meeting?

A. Well, in the last meeting, there was eventually an agreement reached as to how much of the post-petition interest would be paid to the Unsecureds and, if memory serves, there was something like 110 or 116 million out of something like 200 million that was theoretically owed, there was some additional warrants that went to the equity as a quid pro quo for the increased interest for the unsecureds and then there were a couple of other, I would say more structural things what would happen in terms of underwritings and what happened in terms of effects and more or less technical issues and we then, I think literally called in the Public Service people, announced to them that there was a 3–way deal and we told Governor Gregg and he then invited us over to Devine Millimet where there was a press conference announcing the completion of the deal but at that point, the company had still not signed onto the deal.

Q. And the company did not become a proponent of the plan until sometime later?

A. Some weeks later, yes.

Q. What happened in the interim there?

A. As best I can remember, the only issues that were, the only topics that were of interest and the only economic terms that were changed were severance arrangements and pension benefits and such as that for the senior executives of PSNH. There were no economic changes as they related to the unsecureds or to ourselves and/or to the secureds.

Q. Now, I think you used the term vacuum several times during the course of the afternoon. Is it normal in your experience for the Equity Committee to be the leading party in negotiating a Plan Of Reorganization of this type?

A. No, in my experience, that is without parallel.

Q. And you have been involved in many major cases, have you not?

A. Yes.

Transcript, Court Doc. 5863, January 13, 1992, pp. 34–40.

It is also noteworthy that there was no change to the economic substance of the consensual plan "deal" negotiated between all parties other than the debtor on November 18, 1989 thereafter. The only changes other than the expectable technical questions, regarding issuance of securities and implementation, had to do with the negotiation of severance pay and other benefits for the debtor personnel which were agreed upon before the debtor joined as a co-plan proponent on December 13, 1989. (Transcript, Court. Doc. 5863, January 13, 1992, p. 12–13).

Rothschild also made a specific showing at the fee hearing that in the final negotiations it was able to obtain the agreement of Northeast Utilities to give more value to equity, representing some $35 million in additional value, by use of a debt instrument deliberately designed to trade at 122 percent of its par value. Due to the peculiarities of the capital structure involved, these particular securities going to the equity holders did not involve any direct additional cost to the acquisition party. (Transcript, Court Doc. 5863, January 13, 1992, p. 19–20). Rothschild also developed a novel concept of potential competing underwriters to deal with the fractional interest problem that would occur with tens of thousands of holders of equity interests that were getting the debt instruments under the plan. This avoided substantial fees that would have otherwise occurred in the implementation of the plan and allowed some $20 million of additional cash to go to equity without any additional costs to the acquisition party. (Transcript, Court Doc. 5863, January 13, 1992, p. 21–22).

██ On balance, notwithstanding the fact that all of the activity of Rothschild, Inc. can be fairly characterized in topical terms as the normal duties of a financial advisor to an equity committee in a chapter 11 reorganization, the Court concludes that the results obtained for the equity holders in this case were truly exceptional in the sense that the extraordinary vacuum of coordination and leadership by the debtor in controlling the plan process thrust the equity holders and their financial advisor into unchartered waters that required considerable dexterity in

devising strategies to confront what was not only an unprecedented case but an unprecedented absence of direction and control by the debtor in reorganization at the crucial times when its fate was being decided.

The Court also takes note of the specific showing made by Rothschild, Inc. at the final fee hearing establishing that through its ingenuity an additional $55 million in value was provided to its constituency without cost to the superior parties. The devices used to achieve this result were novel and unprecedented and I find accordingly that they involve services that would not necessarily be expectable from professionals charging the base fees which were charged by this applicant.

The Court therefore determines that a total fee of $3,090,000 is reasonable compensation for Rothschild, Inc. for its services in this case, together with reimbursement of $204,663 in expenses, pursuant to § 330 of the Bankruptcy Code.[52]

## XI. PAUL L. GIOIA, EXAMINER

Paul L. Gioia, as the Court-appointed Examiner in these chapter 11 proceedings was allowed by Court order entered August 31, 1990 professional fee compensation in the amount of $268,875 and reimbursement of expenses in the amount of $11,215 (Court Doc. 3899, filed August 24, 1990). His further request, included therein, for a premium enhancement of $200,000 for his services, was deferred by the August 21, 1990 Order to be heard with the final fee applications of the other professionals seeking enhancement of their fees.

After further briefing and responses the Court conducted a hearing on Mr. Gioia's enhancement request on September 27, 1991. The request had been met by objections filed by Northeast Utilities (Court Doc. 5708); the Unsecured Creditors Committee (Court Doc. 5694); the Equity Committee (Court Doc. 5700); the United States Trustee (Court Doc. 5716); and the State of New Hampshire (Court Doc. 5691).

On March 16, 1989, on the same day that the Court entered its Order terminating the exclusivity of the debtor, the Court also entered an order authorizing the United States Trustee to appoint an Examiner pursuant to § 1104 of the Bankruptcy Code (Court Doc. 1899). The United States Trustee interviewed various people and reported that she selected Mr. Gioia as the "unanimous choice of all the negotiating parties in the case". (Court Doc. 2011, dated March 31, 1989 and filed April 3, 1989). The United States Trustee also filed on April 3, 1989 (Court Doc. 2012) her "Certificate of Appointment of Examiner" reciting that Paul L. Gioia "is hereby appointed Examiner in the above-entitled case." The undersigned Judge, thereafter, on April 3, 1989 endorsed "Approved" in the space provided therefore at the bottom of the Certificate of Appointment form. (This Court action has been docketed as Court Doc. 2012A).[53]

In none of the foregoing documents is there a recitation that Mr. Gioia's appointment was on an hourly fee basis nor is there any disclosure as to the amount of his hourly fees. This Court accordingly at the time of the "approval" of his appointment did not make any conscious decision in that regard.[54]

52. Even if Rothschild fee of $3,090,000 were considered to also include the $523,841.25 paid to the consultant R.J. Rudden Associates, Inc., described above, the "total fee" for financial advisor services to the Equity Committee would still be only $3,613,841.25, and that this total level of compensation compares quite favorably to the $3,657,581 paid to Solomon Brothers as financial advisors to the Unsecured Creditors Committee, and the $3,570,297 paid to First Boston as investment banker to the debtor-in-possession.

53. It is not clear whether Court approval is required under § 1104 of the Code once the Court makes the general determination that an Exam-

iner is justified in the case. See 5 Collier on Bankruptcy ¶ 1104.03[4] 15th Ed.

54. As a result of the objections to his final fee request, and as developed at the hearing on September 27, 1991, it is now a matter of record that Mr. Gioia originally protested to the United States Trustee that his regular consulting fee rate of $250 an hour was not appropriate for an Examiner's duties in a chapter 11 proceeding. The United States Trustee however advised Mr. Gioia that the Court in its Memorandum Opinion determining that an Examiner was justified, In re PSNH, 99 B.R. 177, had limited the Examiner's functions in terms of the temporary moratorium context that the Court had decreed following

Gioia at the time of his selection was a senior vice-president with the First Albany Corporation, regional brokerage and investment banking firm, where he headed the firm's activities relating to utilities and energy related companies. He had served as the Chairman of the New York State Public Service Commission from April of 1981 to February of 1987. Previously, he had served on the legal staffs of Governors Rockefeller, Wilson and Carey of New York; as a special assistant to United States Senator Jacob Javits; and as an Assistant District Attorney for New York County. He is a graduate of Fordham University and the Cornell Law School. During his service as Chairman of Public Service Commission the Commission was much involved with the financial problems of the Long Island Lighting Company ("LICO") stemming from its nuclear power plant on Long Island that had encountered substantial financial and environmental opposition. The New York PSC also had to deal with another troubled nuclear power plant while Gioia was Chairman.

The justification for the appointment of Examiner in this case was set out in some detail in the opinion in *In re PSNH,* 99 B.R. 177 (1989). When the Court had determined that same date that the debtor's exclusivity would be terminated, as set forth in the opinion reported as *In re PSNH,* 99 B.R. 155 (1989) the Court in the implementing Order denying further exclusivity extension (Court Doc. 1896) provided for a 60–day moratorium on any multiple plan movements toward confirmation, noting that if no consensual plan was achieved during the 60–day moratorium period the Court would hear on due notice the Report of the Examiner, authorized by the separate Order that date, "as to whether a consensual plan does or does not appear likely should the Court order further delay in moving forward with disclosure statement and confirmation procedures on any pending plans of reorganization." The Court noted further that it would start any such hearing

after the Examiner's Report with the presumption that it should "let the reorganization plan wagons roll" if a consensual plan had not been achieved by that date.

Thus, the original justification for the Examiner was tied to activities relating to the moratorium and the need of the Court to have reports as to whether any significant movement toward a consensual plan was occurring. The Examiner's functions were more specifically detailed in the Order of March 16, 1989 as follows:

(a) "The primary role of the Examiner shall be to determine whether negotiations toward a consensual plan of reorganization are at an impasse. In making this determination, the Examiner shall have full power to inquire of various parties as to their positions in negotiations and to mediate any differences that exist. This mediative role is a necessary concomitant of the Examiner's determination regarding impasse. The Examiner must have the power to test the strength of each party's resolve and the assumptions underlying each party's position. The Examiner shall not seek to achieve any substantive result in negotiations, but rather to determine whether impasse exists and, where appropriate, to facilitate the resolution of substantive differences." *In re UNR Industries, Inc.,* 72 B.R. 789, 795–96 (Bankr. N.D.Ill.1987).

(b) The Examiner shall report on the status of negotiations and the likelihood of a consensual plan, under the provisions and timeframe provided in the Order terminating exclusivity.

(c) The Examiner shall serve as an aid to the Court in understanding the more technical aspects of the Debtor's regulatory requirements and rate structures as necessary during court hearings, pursuing such inquiries of witnesses as the court may direct, or as may be necessary from a neutral and disinterested standpoint to

termination of the debtor's exclusivity, and that the Court expressly indicated that compensation in this regard should be kept at a minimum. (See discussion below.) Pursuant to this advice Mr. Gioia somewhat reluctantly agreed to billing of his services at the $250 an hour rate. It is

unclear whether he and Ms. Greiman, then the United States Trustee, understood that he would have the opportunity to request an enhancement at the conclusion of the case. Ms. Greiman was not called as a witness by either Gioia or the objectors.

clarify and render more understandable such matters as they develop.

(d) The Examiner shall have such additional functions as the court may direct, after notice and a hearing, during the further course of this case.

The Court had also indicated that the examiner should be restricted in the employment of other professionals (*In re PSNH*, 99 B.R. 155, (1989) at 182–84) as follows:

The examiner to be appointed should be an individual rather than a firm. Any necessary clerical aid and reimbursement of expenses will be authorized by supplemental order, to be submitted by the examiner and concurred in by the United States Trustee. The examiner will not be authorized to employ his or her own financial advisors, analysts or other technical professionals, inasmuch as it is a contemplation of the court that the examiner should be able to obtain such professional aid as may be necessary from the various professionals already employed by court order in this estate. In the event that there is any dispute in the making available of such information to the examiner, the court will determine any such dispute or refusal to supply data and information upon an appropriate expedited hearing as may be necessary.

Notwithstanding the foregoing, and the court's comments during the course of the hearings, the court will consider the appointment of *an attorney* experienced in bankruptcy reorganization work to serve as counsel to the examiner for the limited purpose of advising the examiner as to the import of the court's orders and rulings in this case; to advise as to the context and ramifications of hearings in the case as they may develop; to aid in the preparation of such pleadings and reports as may be necessary on behalf of the examiner; and to aid in the examination of witnesses at court hearings as the examiner and the court may direct. The court will consider the appointment of an attorney for such purposes upon request by the examiner, concurred in by the United States attor-

ney, on an expedited basis as may be appropriate. Such appointment, if requested, shall be of an individual attorney and not a law firm.

These limitations were imposed in contemplation of the expected short-term or otherwise limited services then expected of the examiner. The Court did ultimately authorize retention of a single attorney for the Examiner on April 28, 1989 (Court Doc. 2127); and authorized the appointment of an individual utility finance analyst (Court Doc. 2209).

The Examiner's initial Report was filed on May 15, 1989 (Court Doc. 2161) and was heard at the hearing on May 26, 1989 (Court Doc. 2232) discussed above. On the Examiner's recommendation the Court did order a further moratorium by Order entered June 14, 1989 (Court Doc. 2256) which resulted in the August 1989 hearings. Prior to the August hearings, the Examiner on July 31, 1989 filed his Second Report of Examiner (Court Doc. 2349) which created a great deal of consternation among a number of the parties, as reflected in their responses to the Report filed as Court Doc. Nos. 2368 through 2374.[55]

In his Second Report the Examiner voiced the opinion the notwithstanding the current stalemate between the parties at the $2.0 billion enterprise value level his view was that a $2.2 billion level should be achievable in the reorganization as reasonable value, and that even at that level the recovery with regard to the Seabrook nuclear power plant costs would be lower than the recoveries achieved by the other joint owners of Seabrook through their own regulatory procedures. Since the State of New Hampshire had been adamant that no value in excess of $2.0 billion would be considered, and since Northeast Utilities in its second amended plan (Court Doc. 2340) filed on January 27, 1989 had come in at a $1.9 billion value, the consternation of those parties at least is understandable. With regard to other parties in interest the consternation seemed to be more in terms of their view that the Examiner was exceeding his authority and taking over their functions.

---

**55.** It was at this point that Gioia changed from being a "Court Translator" and "Court Monitor" into a "Court Gadfly" to loosen up the process, at some personal risk, as will be described below.

To properly evaluate the Examiner's action in July, and the reaction thereto, it is necessary to give some consideration to the context. The Court's decision to appoint an Examiner in March was reached over the objection of most of the major negotiating parties in the case and was based on the Court's own perception that the chapter 11 case had reached a stalemate. When the stalemate that Gioia was appointed to monitor showed no signs of breaking up he determined to take it upon himself to suggest an enterprise value and to challenge the State to show where his calculations and research data were wrong.[56] Gioia had met with the State representatives on June 22, July 6, July 13, and in a further major meeting, on July 25, 1989, he met with the Governor, legislative leaders, and the State's negotiating team. (Second Report of Examiner, Court Doc. 2349, pp. 15, 19, 23, 28 and 29).

At these meetings, and particularly at the last meeting on July 25th, Gioia aggressively challenged the State's negotiating team to refute the calculations and data that he had presented to support a reasonable value at $2.2 billion. The State at that point angrily responded that they had turned down a $1.9 billion term sheet from the debtor in April and were not about to agree to a greater value than the debtor itself had tendered. Gioia indicated that objections by the State or Northeast Utilities to his suggested level of value would not change his opinion unless they were supported by convincing specific refutations in terms of data and calculations and not general opposition. He stated that he intended to proceed with his Report to the Bankruptcy Court with regard to the $2.2 billion enterprise value achievable.[57] It is clear that it was this activity by the Examiner that triggered the State reaction in concluding the rate agreement with Northeast Utilities that was announced by governor in a press conference on July 27, 1989, a day before Gioia filed his Second Report with the Court.[58]

In a press release issued by the Governor's office on July 27, 1989, announcing the agreement with Northeast Utilities on rate increases over a seven year period, the Governor stated in his own quoted language, "We must act now to forestall the acceptance by the Bankruptcy Court of a report to be filed July 31 by the Examiner in the case which will almost certainly promote a rate plan acceptable to PSNH investors, but which gouges New Hampshire consumers." (Court Doc. 5783, Exhibit A) At the press conference it was reported that Governor Gregg reiterated that he was eager to sign onto some agreement before July 31st when the Examiner was scheduled to file his second report, fearing that the proposal would precipitate a call for rate increases far higher than those in the Northeast Utilities' plan. The Governor is quoted as stating "It is really sort of a fish-or-cut-bait situation, we can't allow the Judge to feel the Examiner's Report is the only game in town." *Concord Monitor*, July 18, 1989, p. A–1 (Exhibit B to Court Doc. 5783). These statements are confirmed by similar news reports in the *Nashua Telegraph*, July 28, 1989. (Exhibit C to Court Doc. 5783).

The foregoing establishes that while Gioia's services in the first couple months of his retention might have been closer to consulting services they rapidly turned into much more intensive activity by virtue of the existing situation and the requirements of the case. In April of 1989, as has been discussed earlier, the debtor had submitted its $1.9 billion term sheet proposal to the State without consulting the other parties in interest. The State had rejected that proposal as being excessive in value. The Committees themselves were disturbed because they felt

---

**56.** While this action was not within the explicit terms of his original retention order this Court did in effect ratify his activity in the August hearings and thereafter.

**57.** In going forward with this Second Report Gioia was at some risk that the Court would react that he was overstepping his bounds and that the State of New Hampshire with its considerable resources, as contrasted to his slim resources under the Court's orders, might attack his calculations and damage his reputation.

**58.** Gioia's Report was actually not docketed until July 31, 1989 but was in fact submitted earlier.

it was inadequate in value.[59] However, by July 27th the provocation and challenge by Gioia to the State had forced the State to come out with a rate plan which, as will be developed subsequently, really could support an enterprise value of $2.2 billion even though in nominal terms it was announced as being at the $1.9 billion level.

The hearings in August and September of 1989 have been discussed in detail above and will not be repeated here. The hearings do establish that all parties eventually recognized that the rate increases agreed to by the State with Northeast Utilities should have supported a greater enterprise value. The Examiner was instrumental in pointing out that the enterprise value calculations regarding the Northeast Utilities' plan rested upon certain undisclosed underlying costs and revenue projections, and other assumptions, that needed to be disclosed for a proper evaluation of that plan and for comparison with other plans.

The Examiner filed a motion to compel disclosure of these underlying assumptions on October 3, 1989 (Court Doc. 2540) which was heard on October 13, 1989 and resulted in this Court's Order of October 16, 1989 (Court Doc. 2687) which provided:

> All pending plan proponents who have not already done so shall produce to the Examiner, at a time and place at his discretion, not later than *October 20, 1989*, the costs and revenue data used in the development of the particular pending plan of reorganization set forth in paragraphs 12(a) through 12(m) of the aforesaid motion, filed as Court Paper No. 2540 in this case.

The Court in the October 16th Order also provided specific new instructions for the Examiner with regard to an important service necessary during the disclosure statement hearings on these complex competing plans of reorganization:

> It is the court's view that the Examiner's focus between now and the commencement of the disclosure statement hearings on November 13th should be in terms of collecting and analyzing the materials herein ordered to be produced, together with similar materials already produced by certain other plan proponents, in order that a draft comparative analysis and/or chart of the competing plans can be presented to this court during the disclosure statement hearings. The court intends to develop a noncontroversial "common segment" of disclosure materials that can be provided to creditors and equity holders along with the particular disclosure materials relating only to a specific plan.

> The "common segment" of disclosure materials referred to in the preceding paragraph should also include a draft of noncontroversial common background, history, and other similar provisions from the various disclosure statements that can be made uniform without prejudice to any plan proponent ...

> The Examiner and the U.S. Trustee are encouraged to work together in developing the "common segment" draft materials for use by the court and the parties during the disclosure statement hearings as indicated above.

The Examiner's motion to compel was important in the multiple plan process because it was necessary to get a realistic rate plan for the bidding process, not only in nominal numbers, but in the assumptions underlying the rate plan that could be translated into enterprise value. The Examiner also provided a substantial service to the Court and to all parties by providing an analysis and report with regard to what the range of expectable results might be in a litigated rate case

---

**59.** Gioia reports that when the State rejected the debtor's $1.9 billion term sheet in April the debtor circulated a $2.2 billion proposal only among the investor parties. The Equity Committee continued to insist that a minimum of $2.5 billion would be required for a consensual plan. Gioia asked the debtor to hold off on submitting the new proposal to the State while he did further analysis and research. He reviewed New Hampshire laws and regulations and case precedents

involving the Seabrook plant, and compared previous proposals to the allowed recoveries for major nuclear construction projects throughout the country, with particular focus on recoveries achieved by the other Seabrook joint owners. Gioia's Report and analysis also was instrumental in convincing the Equity Committee to make a more realistic appraisal of the recovery that could be achieved in a litigated proceeding.

if a consensual plan of reorganization were not achieved. Gioia thereafter gave his analysis in various draft reports during the disclosure statement hearings and refined the litigated rate case analysis into formal reports filed in conjunction with the plan confirmation hearings which commenced on April 4, 1990. See "Report of Examiner re: Consideration of a Seabrook Rate Case as an Alternative to Proposed Plan of Reorganization" (dated March 30, 1990; filed April 3, 1990) (Court Doc. 3437); and "Supplemental Report" (dated April 5, 1990; and filed April 6, 1990) (Court Doc. 3455). This was essential not only to the disclosure statement process, with portions thereof being included in the final approved disclosure statement, but also to the ultimate confirmation of the plan.[60] This litigated rate case report developed a rationale for establishing a credible upper and lower range of reasonable outcomes from a Seabrook rate case that was necessary for evaluating the major compromise embodied in the plan.

Gioia's sworn declaration notes that his firm, First Albany Corporation, generally charges fees based upon the total amount of investment in a particular financial transaction rather than an hourly rate. "Only when I provide consulting services is my fee based on an hourly rate. However, my normal consulting services simply do not involve responsibilities comparable to those imposed on me as examiner nor do they require the same broad scope of expertise or involve the same kind of measures or seriousness of consequences as were involved in this case." (Court Doc. 5711, p. 12).

It is impossible to divorce Gioia's status as the former chairman of the NYPSC from the substantial effect his $2.2 billion calculation had upon the other parties and particularly the State of New Hampshire. Gioia was also invaluable to the Court in translating the jargon of the utility world into understandable English for the Court.

It is also obvious that Gioia's experience on the NYPSC allowed him to get up to speed very quickly "and with authority" in analyzing the difficult regulatory issues presented by the PSNH case. He had been directly involved in determining the allowed recovery of utility investments in two major nuclear power plants in New York and in the development of long-term rate plans. It is only in hindsight that the proposal by the Examiner to settle the case at a level of $2.2 billion may seem uncontroversial and within his assigned duties but that was not the case at the time.[61] As noted above, there were risks not only of overstepping his authority but some risk to his professional reputation if it were shown to be not well-founded. Gioia could have taken the passive role that the original order contemplated and probably could have gotten more total compensation at the $250 level as the case dragged on in stalemate. A less experienced examiner might have had that result.[62]

 Considering all of the foregoing, the Court concludes that the $200,000 additional request by the Examiner is justified in this case and will be so awarded as reasonable compensation pursuant to § 330 of the Bankruptcy Code. Mr. Gioia's work in this case

---

**60.** Although the multiple plan process ended in a consensual plan that did not require the comparative discussion of rate plans which the Examiner was also ordered to produce, and did draft during the course of the disclosure statement hearings, the work of the Examiner was invaluable to the Court in evaluating the adequacy of the disclosures being presented during the course of those hearings. Transcript, Court Doc. 2392, August 11, 1989, pp. 106–07; Transcript, Court Doc. 2527, September 22, 1989, pp. 45–53; Transcript, Court Doc. 2798, October 27, 1989, pp. 115–118; and see, e.g., Court Doc. 2944, paragraphs 2 and 3.

**61.** Back in 1989, in various pleadings, both Committees had occasion to comment upon and concede the importance of Gioia's actions prior to

the August hearings. Even after the present fee dispute was joined both committees again recognized that Gioia had done a very good and effective job. Transcript, Court Doc. 5795, September 27, 1991, pp. 39, 47–48.

**62.** Gioia's actions in my judgment cut somewhere between two to four months off the time it took this case to get to a confirmed plan. The total administrative fees and expenses in this case, as indicated in the Annex to this opinion, are somewhat in excess of $50 million from the commencement in January of 1988 through the various basic fee allowances by the Fall of 1991. A simple calculation will indicate that Gioia's $200,000 enhancement request is minuscule in relation to the monthly administrative cost of these proceedings.

required extraordinary effort and I believe rose to the "rare" and "exceptional" results not fairly contemplated at the time of his original retention when he acquiesced in billing his time at his consulting rate. Alternatively, even if his services were deemed not to qualify for premium enhancement under those standards, I would conclude that a $250 an hour consulting fee would not be an appropriate and reasonable compensation for his increased responsibility and activity as the case progressed. Being a Court-appointed Examiner in a chapter 11 major reorganization proceeding is not the same as being a consultant. It deserves a higher rate of compensation when it requires the affirmative and aggressive action by the Examiner that was required in this case.[63] On either basis then this Court will approve the additional request by the Examiner.

### XII. UNITED ILLUMINATING COMPANY

On August 7, 1991, United Illuminating Company ("UI") submitted an application for an allowance of compensation and reimbursement of expenses totaling $2,980,000 for professional services rendered on behalf of UI by its various professionals, pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) as having made a "substantial contribution" in the chapter 11 case. ("UI Application", Court Doc. 5657.) The application was heard on January 27, 1992.

By agreement of the parties, the Court entered an Amended Order on January 23, 1992 (Court Doc. 5864), limiting the January 27, 1992 hearing to the legal question: "Whether UI, as the unsuccessful bidder for the assets of Public Service Company of New Hampshire, is entitled to recover fees under § 503(b) of the Bankruptcy Code?" Accordingly, the Court took no evidence on the factual question of "substantial contribution" and the parties only addressed the issue of whether UI, as a matter of law, had stated a claim cognizable under 11 U.S.C. § 503(b)(3) and/or 11 U.S.C. § 503(b)(4).[64]

In its application UI states that as a consequence of its participation in the plan and auction process UI believed that "it was largely responsible for the substantial increase in the total value being distributed to creditors and shareholders under the plan which was ultimately confirmed." *UI Application* at page 3. In its own words, UI believes that:

> There can be no clearer evidence or proof of an actual, significant and demonstrable benefit to a chapter 11 case than an increase in overall value by approximately $300,000,000, which likely would not have been realized but for UI's active and ongoing participation in the bidding process.[65]

*UI Application* at pages 11–12.

In essence, UI has arrogated unto itself direct responsibility for an increase of ap-

**63.** The objectors in unison chant "he named his asking price and he got it" and therefore believe that no higher rate of compensation is appropriate. Putting aside for the moment whether he really understood the significance of his conversation with Ms. Greiman as being an asking price in the formal sense suggested by the objectors, and even ignoring the fact that this Court never approved an hourly rate as a lodestar base compensation factor, the fact is that his "asking price" was too low. See *In re Elmendorf*, 57 B.R. 580, 586 (Bankr.D.N.H.1986). Had he known he would become the "Court Gadfly" guaranteed to annoy all parties-in-interest equally he probably would have asked for more.

**64.** The Court notes that since none of the professionals that assisted UI in preparation of their disclosure statements and plans of reorganization for purposes of engaging in the bidding for control of the debtor were retained by orders of this Court pursuant to 11 U.S.C. § 327 and Fed.

R.Bankr.P. 2014, the UI application is not considered under 11 U.S.C. § 330 as were the prior applications dealt with in this Opinion. The UI professionals can be compensated, if at all, under 11 U.S.C. § 503(b). The UI application however has been considered in conjunction with the other applications because the "substantial contribution" factor relevant to UI's request is somewhat akin to the "premium enhancement" factors relevant to the other applications.

**65.** At various points in the application, UI attempts to quantify the exact dollar amount of the benefit they claim they conferred by being a bidder in the auction bidding process. It is unnecessary for present purposes to determine that these assertions are well-founded. The Court will assume in this procedural context, on the limited question of law presented, that UI's participation in the plan auction process had the effect of causing some increase in the amounts bid.

proximately $300,000,000 because of its participation in the auction bidding process. UI has even claimed that without its participation the "substantial increase in value never would have materialized or been realized." *UI Application* at page 3. UI is apparently alone in this belief. The United States Trustee (Court Doc. 5729), the Official Committee of Equity Security Holders (Court Doc. 5699), the Northeast Utilities Service Company (Court Doc. 5681),[66] and the State of New Hampshire (Court Doc. 5692) have all filed objections to the UI Application.

### *"The Law of Economic Self–Interest"*

■ Cases addressing the issue of a creditor's claim of substantial contribution have all arrived at the same basic truth: Creditors normally act in their own economic self-interest and any incidental benefit to the estate is an indirect by-product of their pursuit of their own self-interest.[67] Given this reality, it is hardly surprising that courts greet creditors' "substantial contribution" claims with a degree of skepticism. The law in this area has coalesced to the point that it may fairly be stated that when a creditor is pursuing its own economic self-interest, as by definition it does as a bidder at a bankruptcy auction, then that creditor cannot establish the requisite "direct benefit" which the case law requires in order to grant a creditor a section 503(b) award.

This basic understanding about creditor economic self-interest was observed by the court in *In re FRG*, 124 B.R. 653, 659 (Bankr.E.D.Pa.1991):

> Our observations at the hearings in August and September, 1990, verified the Committee's allegations that the efforts of the Debtors and Committee to stimulate bidding for the Debtors' assets was the

most direct causative factor for the ultimate increment in the amount of NHP's purchase offer. The presence of USREA, and the presence of the other prospective purchasers, were obviously necessary instruments to the successful bidding process. However, it is difficult to argue that USREA, as a mere instrument in the process, could be found to have acted primarily for the benefit of the Debtors' estate in its participation. Rather, it is apparent that the Applicants were acting primarily on behalf of their own interests as one of the potential purchasers of the Debtors' assets in participating in the bidding process and in pressing that participation to the point of injecting themselves into the administration of this case. Thus, any benefit to the Debtors' estates flowing from these activities was purely incidental.

The same fundamental economic precept was observed by the court in *Matter of Cuisinarts*, 115 B.R. 744, 750 (Bankr.D.Ct.1990) when a creditor asserted a section 503(b)(3) and section 503(b)(4) claim in the amount of $1,033,446.91, the sum the creditor had paid to two law firms and one investment banker retained to advance the creditor's interest. In a terse summation of economic reality, the court wrote:

> Creditors are presumed to act primarily in their own interests and not for the benefit of the estate as a whole, *In re U.S. Lines, Inc.*, 103 B.R. 427, 430 (Bankr.S.D.N.Y. 1989); *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 571 (Bankr.D.Utah 1985), and case law to date is clear that '[e]fforts undertaken by a creditor solely to further his own self-interest ... will not be compensable, notwithstanding any incidental benefit accruing to the bankruptcy estate.' *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988); see *In re D.W.G.K. Restaurants,*

---

**66.** In its memorandum in support of its objection, Northeast Utilities devoted a substantial effort in an attempt to prove that UI did not have standing to make a 503(b)(3) application because it was not a creditor of PSNH. In fact, UI was a creditor of PSNH and a proof of claim was filed on UI's behalf by New England Power Pool ("NEPOOL"). UI's Response to Objections, Court Doc. 5735 at p. 4 n. 1. While the proof of claim that UI relies on was filed in the name of NEPOOL, and not UI, the Court is satisfied that NEPOOL is an organization of member utilities,

not a separate corporation or legal entity. The NEPOOL proof of claim included an exhibit A, "Summary of PSNH Shortfall Billings," which shows a PSNH shortfall liability to UI in the amount of $37,117.68.

**67.** Indeed, UI itself admitted that "it was pursuing its own economic interest in seeking to be the successful plan proponent." *UI Application*, p. 5 at ¶ 7, p. 49 at ¶ 14.

*Inc.*, 84 B.R. 684, 689 (Bankr.S.D.Cal. 1988).

Economic reality compelled the Tenth Circuit to arrive at the same legal conclusion in *In re Lister*, 846 F.2d 55 (10th Cir.1988). *Lister* involved a creditor's 503(b)(3)(D) request for $326,000 dollars for his unsuccessful efforts to execute a judgment against the debtors. Notwithstanding his pre- and post-petition efforts, the Tenth Circuit concluded his activities were undertaken "solely for the purposes of collecting his judgment." *Id.* at 57. Like the other courts facing this kind of claim, the Tenth Circuit concluded that "[e]fforts undertaken by a creditor solely to further his own self-interest, however, will not be compensable, notwithstanding any incidental benefit accruing to the bankruptcy estate." *Id.*

In another pertinent decision, *In re American 3001 Telecommunications, Inc.*, 79 B.R. 271 (Bankr.N.D.Tex.1987), a telecommunications company that was in competition with the debtor had filed a competing plan of reorganization. The competing plan provided for the proponent's acquisition of the debtor's assets, however it was ultimately unsuccessful, a situation factually similar to UI's circumstances. Thereafter, the bankruptcy court denied the proponent's application for compensation under section 503 and commented:

> The policy behind this statute is to encourage meaningful creditor participation in the reorganization process. However, in general, "a creditor's attorney must ordinarily look to its own client for payment, unless the creditor's attorney rendered services on behalf of the reorganization, not merely on behalf of his client's interest,

and conferred a significant and demonstrable benefit to the debtor's estate and to the creditors."

*Id.* at 273, *citing In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir. 1986), *quoting In re General Oil Distributors*, 51 B.R. 794, 806 (Bankr.E.D.N.Y. 1985).[68]

One case has observed the possibility of creditor-debtor "joint" economic self-interest. In *In re Frog and Peach, LTD.*, 38 B.R. 307 (Bankr.N.D.Ga.1984), Judge Britton observed that "a creditor/applicant normally has a concurrent interest along with the debtor in promoting a successful reorganization." *Id.* at 310. While this dicta may be true in certain situations, it is not true here. UI's stratagem from the word go was to acquire control of the debtor and profit thereby. To the Court's mind, that is an adverse position and the logical opposite of anything remotely resembling a primary intent and effort to benefit the debtor. In any event, the creditor's claim in *Frog and Peach* was denied when the court concluded that "the policy of inducing creditor involvement in a bankruptcy proceeding would not be furthered by allowing [the applicant's] administrative claim." *Id.* at 310.

Put together, the law in this area has coalesced around the fundamental economic understanding that creditors in a bankruptcy auction context are in pursuit of their own economic self-interest. This being the case, any benefit to the estate is at best indirect and incidental and will not support a creditor's after-the-fact substantial contribution claim. Simply stated, a creditor's after-the-fact attempt to "spin" a square block into a

---

68. UI seeks to distinguish *American*, contending that the factual basis underlying that decision is "completely opposite" from the facts *sub judice*. In *American*, the competing plan proponent, North American Paging Corporation (NAPC), sought to acquire the debtor's company at a distressed "bargain basement" price and abandoned its effort when other entities came forward that were prepared to pay significantly more. The bankruptcy court found that NAPC did not confer a benefit upon the estate within the meaning of section 503(b), because the proposed dividend to the creditors under NAPC's plan would have been less than provided by other plans, and therefore it could not be said that NAPC's plan benefitted the estate. UI maintains that, conversely, it actively participated throughout the plan process, and repeatedly increased its bid and improved the terms in its proposed plan, thereby causing NU to substantially increase and improve its bid. These distinctions are not relevant to this Court's reference to *American* for the point that creditors competing in the plan process are usually acting primarily in their own self-interest, and if there is an ancillary benefit to the estate, it is incidental to the self-serving purpose of that creditor's involvement. The point is that the actual holding in *American* was to *deny* a § 503(b) claim of an unsuccessful bidder.

round hole not only violates the law of physics but the law of self-interest.

### "Level Playing Field"

 There is an alternative basis for denying the UI Application, which is that their request for section 503 compensation is an attempted "end run" around the Court's careful attempts to have a level playing field, particularly in the competing disclosure statements and multiple plan "bidding" process.

As the objection by the Official Committee of Equity Security Holders noted, this Court's Order dated August 18, 1989 (Court Doc. 2400) established the ground rules for the auction and directed that any entity seeking to acquire all or substantially all of the debtor's assets was required to proceed by filing a plan of reorganization and disclosure statement or by submitting a bid to the debtor and its financial advisor which the debtor might incorporate into its own plan.

The Equity Committee's objection noted that at that time I indicated to the parties that I was concerned that all "lurking ambiguities be removed from the process." *Objection of the Official Committee of Equity Security Holders* at page 3 (Court Doc. 5699). The Equity Committee objection described the filing of a plan and disclosure statement as the de facto "ticket of admission" to the auction and points out that the Court's Order of August 18, 1989 contained no provisions for the reimbursement of a losing bidder's fees and expenses. *Id.* at pages 2–3. The Court, in a series of hearings held in August and September of 1989 developed procedures for plan and disclosure statement hearings after seeking input from all parties-in-interest as to all processes and conditions to be implemented. *Id.;* see *also* discussion of chronology and procedure, above, at Section IV of this Opinion.

At the conclusion of the January 27, 1992 hearing, I directed UI to furnish the Court with any reference in their disclosure statement(s) relating to the possibility that UI might make a section 503(b)(3)(D) or section 503(b)(4) "substantial contribution" to the estate fee and expense application relating to the plan auction process used in this case.

By letter memorandum dated February 6, 1992, special counsel for UI directed the Court's attention to a UI disclosure statement, specifically pages 114–116, which was approved by the Court by Order dated December 8, 1989 (Court Doc. 2944), which UI believes clearly put the Court and all other parties-in-interest on notice that UI would be seeking the allowance of section 503(b)(3)(D) or section 503(b)(4) compensation if and when they became a losing bidder. At page 115, the UI disclosure statement contains the following paragraph:

> The second [category of administrative claimants] consists of claims for fees and expenses awarded by the Bankruptcy Court (i) for the services of professionals employed by Public Service and by each of the Creditors' Committee and the Equity Committee during the course of this reorganization proceeding, as well as expenses incurred by the members of each committee and (ii) for expenses incurred by other parties in making a 'substantial contribution' in the Reorganization Case. Neither UI nor the Creditors' Committee has determined whether any such other party will be able to demonstrate such a 'substantial contribution' that would entitle it to recover professional fees and expenses from Public Service.

The Court has read the language of the above-quoted paragraph carefully and is not satisfied that this is the kind of before-the-fact adequate disclosure and request for approval necessary to put the parties, and, for that matter, the Court on notice that UI would in fact request a section 503(b)(3)(D) or section 503(b)(4) compensation in the event that it turned out to be the losing bidder, and to establish any right of UI to assert such a claim. Neither UI nor any other party obtained a specific order that UI or any other party would be entitled to the kind of "break-up fee" that UI is now seeking. The above-quoted language wholly fails to put any party on notice that UI would claim entitlement to such a break-up fee, and UI cannot now substitute the above-quoted paragraph in place of the kind of before-the-fact specific order that would have put everybody, including the Court, on notice.

In fact, no case cited by UI, nor any case that this Court is aware of, has ever held that a losing bidder is entitled to a benefit-the-estate fee or a break-up fee if that right was not established by court order before the auction. The cases that have actually touched on this issue have denied such claims. See, *e.g., In re FRG, Inc.,* 124 B.R. 653 (Bankr.E.D.Pa.1991) (Applicant's request for compensation of $85,000 denied); *In re Lister,* 846 F.2d 55 (10th Cir.1988) (Application for administrative expenses by creditor who did not have prior court approval to act for estate denied by Bankruptcy Court, denial affirmed by Court of Appeals); *In re American 3001 Telecommunications, Inc.,* 79 B.R. 271 (Bankr.N.D.Tex.1987) (Application for expenses filed by unsuccessful competing company plan proponent denied); *In re Frog and Peach, LTD.,* 38 B.R. 307 (Bankr. N.D.Ga.1984) (Unsuccessful purchaser's application for expenses denied).

Moreover, where "break-up" fees of the kind UI now seeks have been allowed, such allowance has occurred in situations where all parties and the Court were on notice that such application will be forthcoming. See, *e.g. In re Integrated Resources Inc.,* 135 B.R. 746 (Bankr.S.D.N.Y.1992), *aff'd,* 147 B.R. 650 (S.D.N.Y.1992), *appeal dismissed,* 3 F.3d 49 (2d Cir.1993). (Court approved debtor-in-possession's modified "break-up" fee agreement with plan financier which was condition precedent to funding plan of reorganization). Notwithstanding the fact that the Court in the present case approved the UI disclosure statement, and regardless of the fact that the disclosure statement contained within it the oblique reference that some parties, unidentified, might seek reimbursement for expenses on the basis of "substantial contribution" to the reorganization case, the UI disclosure statement does not explicitly contain any statement that UI itself would seek such "substantial contribution" fees and expenses in the event that UI was a losing bidder.[69] Furthermore, that disclosure is inadequate for the purposes of an after-the-fact application for fees under section 503(b)(3) or section 503(b)(4) by a losing bidder claiming substantial contribution to the estate.

I believe that any party who contemplates making a section 503(b)(3) or section 503(b)(4) application upon becoming a losing bidder in a bankruptcy auction process is under an affirmative duty to establish their legal entitlement to such compensation prior to the auction bidding process by an appropriate motion. That way, everybody involved in the case will know that one bidder may be making an application after the fact and others can seek similar rights or can adjust their bids accordingly.

There is good reason why this kind of application must be brought to the Court's attention specifically by separate motion and not be buried within some generalized language in a disclosure statement. The policy behind bankruptcy auctions, and auctions generally, is that all bidders be on equal footing on a level playing field. See, *e.g., In re Rancourt,* 153 B.R. 380, 383 (Bankr. D.N.H.1993) (in context of a claimed statutory right of first refusal "to enforce that claimed right destroys the federal statute and the auction bidding process"). As the Bankruptcy Court for the Southern District of New York recently observed, "A break-up fee may discourage an auction process and preclude further bidding when the fee is so large as to make competing bids too expensive." *In re Integrated Resources, Inc.,* 135 B.R. 746, 750 (Bankr.S.D.N.Y.1992), *aff'd,* 147 B.R. 650 (S.D.N.Y.1992), *appeal dismissed,* 3 F.3d 49 (2d Cir.1993).

All bidders include in their total internal calculation of a maximum "bid" not only their direct bid but also the amount of their professional expenses. If one bidder is compensated for their participation, then the party receiving a section 503(b) compensation after-the-fact may artificially inflate its bid and in so doing perhaps alter the outcome on the knowledge that if it loses, it risked virtually nothing. Were the Court to grant UI's application, its transactional costs would approach zero and UI could bid more than the

---

**69.** On December 8, 1989, United Illuminating had to all intents and purposes dropped out of the plan auction process since the case was essentially over regarding competitive plans and the Joint Plan then pending only awaited a final revision of its disclosure statement after the special legislative session in mid-December acted on the rate agreement.

other parties. This the Court considers to be a perversion of the auction bidding process.[70]

UI has emphasized to the Court its belief that the decision of *In re McLean Industries, Inc.,* 88 B.R. 36 (Bankr.S.D.N.Y.1988) supports its entitlement to a section 503(b) fee. There is general language that would support one aspect of UI's argument: "If, however, an attorney renders services not only on behalf of his or her client's interests, but he or she also confers a significant and demonstrable benefit upon the creditors of the estate, the expenses thereby incurred should be compensated." *Id.* at 39. The problem for UI is that *McLean* did not involve facts of a losing bidder at a bankruptcy auction. While it is true that the creditor in *McLean* was granted a section 503(b) award, the "substantial contribution" on which the award was based was that creditor's objection to a low-ball bid for the stock of a subsidiary of the debtor. That's just not relevant here.

Likewise, UI's reliance on *In re American 3001 Telecommunications, Inc.,* 79 B.R. 271 (Bankr.N.D.Tx.1987) is misplaced. UI has attempted to distinguish away *American 3001* on the basis that the bidder there was making a low-ball bid and when it became clear its plan was going nowhere, abandoned active involvement in the case. All that appears to be true from a reading of the case. But rather than detract from the thrust of this Court's holding, it confirms the central belief that bidders act in their own economic self-interest. As Judge Abramson summed up: "In short, if American [the bidder] had been successful, the benefit would have accrued only to American, not to the creditors of the estate. Legal services provided solely for the benefit of a creditor or client are not compensable from the bankruptcy estate." *Id.* at 273.

### The Question Presented and Answered

As stated above the precise question presented to the Court for decision is "whether UI, as the unsuccessful bidder for the assets of Public Service Company of New Hampshire, is entitled to recover fees under § 503(b) of the Bankruptcy Code?" The Court answers this question in a negative in that it concludes on both bases set forth above that such a claim is not cognizable under 11 U.S.C. § 503(b)(3) and/or 11 U.S.C. § 503(b)(4) in a bankruptcy sale or auction bidding process in which the right to claimed compensation under these statutory provisions, for the cost of engaging in the sale or bidding process is not established beforehand as a term and condition of the sale or bidding process, and is not made generally available to other bidders on request. Notwithstanding all the dicta cited in UI's briefing no case has actually *decided* to the contrary. This disposition of the question presented makes it unnecessary to proceed with an evidentiary hearing with regard to the UI application and that application will be denied by separate order.

### XIII. CONCLUSION

The Court's conclusions with regard to the various applications are set forth at the end of each segment of this opinion dealing with a particular application and will not be restated here. It does need to be stated that in the final analysis, notwithstanding all formulas and standards, the Court must make an ultimate determination that the amount awarded is "reasonable compensation" for the services provided pursuant to § 330 of the Bankruptcy Code. This requires a determination in the entire context of the case, when the reorganization proceeding is completed, as to whether the dollar amounts awarded are reasonable in that context. I believe that the fees awarded in accordance with this opinion and as set forth in the separate omnibus order on final awards are in fact reasonable compensation in that light. It must be remembered that the setting of fees in the final analysis is "an art, not a

---

**70.** It may well be that in a particular case *if raised at the outset* when the terms and conditions of an auction bidding process are established, that it might be economically justifiable to provide compensation for losing bidders, to increase the likelihood of substantial bids, and to assure that no bidder would "leave anything on the table" to cover its costs. However such a procedure would require some extraordinary facts and justification and certainly would deserve explicit treatment by formal motion and order.

science"[71] and that few rulings in a bankruptcy case "generate more outrage from the public, anxiety among attorneys, and tribulation for Judges" then the setting of professional fees in such cases.[72] The process unfortunately is "distasteful" to the Court and "demeaning to the professional" but nevertheless is mandated by the Bankruptcy Code.[73]

The trial court in this process is not seeking the "medieval just price"[74] nor an "exact fee" or the "right fee" but rather a reasonable fee under the statute.[75] Moreover, the fee-setting court must temper its consideration of its familiarity with the case by the fact that most of the professionals' activity is normally conducted outside the courtroom.[76] Finally, under the appellate guidelines, the trial Court is enjoined from an easy resort to upward adjustments or enhancements of fees merely because of "extraordinarily high quality"[77] or "uncommon diligence, skill, integrity [and] quality [which] may account for [the client's] success" in the case before the Court.[78]

Within these parameters I've done the best that I can in trying to come to a fair evaluation of the services of the particular applicants in reaching the ultimate determination as to reasonable fee for their services. In doing this I have had to interpret and "fill in" some aspects of the applicable appellate guidelines that I believe are implicit but have not heretofore been clearly synthesized to eliminate practical and latent conflicts in applying those guidelines.

Finally, this Court noted early in the case, when authorizing retention of professionals at relatively high hourly rates, that for the experienced reorganization professionals involved, those rates would be justified since their experience should translate into accomplishing their objections sooner than less-experienced professionals and therefore cut down the overall cost of the proceedings notwithstanding the higher nominal rates. *In re PSNH*, 86 B.R. 7, 11 (1988).[79] It may well be that in an appropriate case, and with a strong enough specific showing, an additional ground for enhancement of final fees could be a specific showing that the case in question was clearly and demonstrably completed in substantially less time than would have been expectable and that an increased final fee award would be justifiable, not in terms of enhancement over hourly rates, but in recognition that the total dollars of fees incurred were substantially less than expectable. A very high nominal hourly rate calculation on a final fee award in such a case should not defeat reasonable compensation viewed in terms of those total costs compared to a longer process of reorganization.[80] In the present case, however, after a complete review of this record I do not believe that this case was substantially shortened in its duration from the time fairly expectable for its completion at the outset.

---

**71.** *In re Gillett Holdings, Inc.,* 137 B.R. 475, 481 (Bankr.D.Colo.1992).

**72.** *Id.,* at p. 482.

**73.** *In re Drexel Burnham Lambert Group, Inc.,* 133 B.R. 13, 15 (Bankr.S.D.N.Y.1991).

**74.** *Matter Continental Illinois Securities Litigation,* 962 F.2d 566, 568–569 (7th Cir.1992).

**75.** *In re Gillett Holdings, Inc., supra,* at p. 475.

**76.** *Matter of Continental Illinois, supra,* at p. 570.

**77.** *Matter of UNR Industries, Inc.,* 986 F.2d 207, 210 (7th Cir.1993).

**78.** *In re Data General Corporation v. Grumman Systems Support Corp.,* 825 F.Supp. 361 (D.Mass. 1993).

**79.** "True economy of administration in a reorganization case must be determined not by hourly rates *per se* but rather by the overall "bottom line", i.e., the total hours expended to hopefully accomplish a successful reorganization. If experienced attorneys can accomplish that task at high rates in one year, whereas less experienced attorneys at lower rates may take five years to do the job, the *total cost* to the estate in terms of *total dollars* will normally be lower in the first instance notwithstanding the higher hourly rates." *Id.* at 11.

**80.** Such an optional method of compensation would have the benefit of not encouraging professionals to proceed on a "cost plus" retention basis, in which the more hours expended the more total fees would be incurred in the case, but would encourage them to act as expeditiously as possible.

### SUMMARY OF PAYMENTS TO PSNH REORGANIZATION PROFESSIONALS

[Prior to any upward or downward adjustments per pending motions of base hourly rate fees as billed and paid on interim allowances during the case. Also excludes any § 503(b) allowances under the pending U.I. request]

| | | |
|---|---|---|
| DEBTOR—CATEGORY I | TOTAL FEES AND EXPENSES: | $19,445,795.75 |
| DEBTOR—CATEGORY II | TOTAL FEES AND EXPENSES: | $ 1,364,933.31 |
| UNSECURED COMMITTEE | TOTAL FEES AND EXPENSES: | $ 8,796,646.28 |
| EQUITY COMMITTEE | TOTAL FEES AND EXPENSES: | $ 7,025,481.78 |
| EXAMINER | TOTAL FEES AND EXPENSES: | $ 838,578.05 |
| SECURED CREDITORS | TOTAL FEES AND EXPENSES: | $ 6,692,444.99 |
| STATE OF NEW HAMPSHIRE | TOTAL FEES AND EXPENSES: | $ 6,142,568.01 |
| | TOTAL | $50,306,448.17 |

### DEBTOR—CATEGORY I: $19,445,795.75 (TOTAL FEES AND EXPENSES)[1]

| Applicant | Fees Approved | Expenses Approved |
|---|---|---|
| Stutman, Treister 5805 (10/24/91) | $ 4,344,707.00[2] | $ 379,931.94 |
| Cahill, Gordon 5793 (10/17/91) | $ 2,969,002.72[3] | $ 629,148.20 |
| Sulloway, Hollis 5819 (10/31/91) | $ 2,487,796.63 | $ 123,679.03 |
| First Boston 5806 (10/24/91) (# 5644) | $ 3,570,297.00[4] | $ 224,094.43 |
| Shaw, Pittman, Potts 4550 (10/26/90) | $ 243,308.75 | $ 19,331.42 |
| Bruder, Gentile & Marcoux 4550 (10/26/90) | $ 224,403.78 | $ 18,574.56 |
| Peat, Marwick 5835 (11/20/91) | $ 699,130.00 | $ 69,121.50 |
| Ropes & Gray Counsel to debtor 4246 (9/6/90) | $ 2,828,071.79 | $615,197.00 |
| TOTAL FEES: | $17,366,717.67 EXP: | $2,079,078.08 |

[1] Category I includes those professionals whose activities included actions directly related to the chapter 11 reorganization effort by PSNH. While the last four firms listed were denominated "non-reorganization professionals" for procedural reasons after the NU acquisition plan was confirmed in April of 1990, an examination of their final fee applications indicate significant overlap with expectable chapter 11 reorganization activity of the other professionals listed. See e.g., Court Document No's 3951, 3954, 3955, and 3957.

[2] Base amount requested at hourly rates—subject to determination of that plus requested premium increase to $7,500,000.00 [Nothing yet finally allowed].

[3] Includes interest per # 5895.

[4] This is the Financial Advisor fee only. FB also requests (# 5647) a $4,500,000.00 transaction fee for M & A activity [Nothing yet finally allowed].

### DEBTOR—CATEGORY II: $1,364,933.31 (TOTAL FEES AND EXPENSES)[5]

| Applicant | Fees Approved | Expenses Approved |
|---|---|---|
| Keller & Heckman 4246 (9/6/90) | $ 6,525.00 | $ 449.41 |
| Tyler Cooper & Alcorn 4246 (9/6/90) | $ 40,023.20 | $ 1,127.60 |
| Tourtelot, Ross & Gray 4548 (10/26/90) | $ 235,000.00 | |

| | | |
|---|---|---|
| Gormley & Kaklamanos 4548 (10/26/90) | $ 3,632.00 | |
| Debbie Sklar 4548 (10/26/90) | $ 3,710.00 | |
| Sheehan, Phinney 4550 (10/26/90) | $ 155,634.70 | $10,674.12 |
| Drummond, Woodsom 4550 (10/26/90) | $ 49,934.50 | $ 3,085.09 |
| Doub, Munzing & Glasgow 4550 (10/26/90) | $ 254,818.23 | $ 5,607.98 |
| Troutman, Sanders 4550 (10/26/90) | $ 113,809.50 | $17,158.14 |
| Coopers & Lybrand 5486 (4/9/91) Accountants/debtor | $ 79,902.09 | $ 6,414.24 |
| Gallagher, Callaghan 4550 (10/26/90) | $ 361,726.00 | $15,701.51 |
| TOTAL FEES | $1,304,715.22 | EXP: $60,218.09 |

[5] Category II includes those professionals whose activities did not include actions directly related to the chapter 11 reorganization effort by PSNH.

### EXAMINER: $838,578.05 (TOTAL FEES AND EXPENSES)

| Applicant | Fees Approved | Expenses Approved |
|---|---|---|
| Paul Gioia, Examiner (# 4214) | $268,875.00[6] | $ 11,215.70 |
| George Hahn, Counsel to the Examiner 4246 (9/6/90) | $364,805.70 | $ 95,018.15 |
| Patrick Piscitelli, Utility Analyst for Examiner 4246 (9/6/90) | $ 92,437.00 | $ 6,224.50 |
| TOTAL FEES | $726,119.70 | EXP: $112,458.35 |

### UNSECURED COMMITTEE: $8,796,646.28 (TOTAL FEES AND EXPENSES)

| Applicant | Fees Approved | Expenses Approved |
|---|---|---|
| Kramer, Levin 5793 (10/17/91) | $4,054,434.98[7] | $663,060.31 |
| Deasy & Dwyer 5818 (10/31/91) | $ 244,504.40 | $ 23,166.41 |
| Salomon Bros. 5836 (11/20/91) | $3,657,581.00 | $ 97,730.18 |
| Skadden, Arps 4666 (11/19/90) | $ 50,525.00 | $ 5,644.00 |
| TOTAL FEES | $8,007,045.38 | EXP: $789,600.90 |

[6] Plus additional $200,000.00 in pending premium request [Has been paid base plus expenses].
[7] Includes interest per 5895.

### EQUITY COMMITTEE: $7,025,481.78 (TOTAL FEES AND EXPENSES)

| Applicant | Fees Approved | Expenses Approved |
|---|---|---|
| Whitman & Ransom 1/8/92 5793 (10/17/91) | $3,206,695.93[8] | $632,231.32 |
| Baker & Botts 4666 (11/19/90) | $ 96,126.00 | $ 5,228.62 |
| Rothschild, Inc. 5792 (10/17/91) | $2,090,000.00[9] | $204,663.11 |

| | | |
|---|---|---|
| R.J. Rudden<br>5820 (10/31/91) | $ 523,841.25 | $ 30,995.55 |
| Price, Waterhouse<br>5821 (10/31/91) | $ 225,283.00 | $ 10,417.00 |
| TOTAL FEES | $6,141,946.18 | EXP: $883,535.60 |

[8] This amount is the original amount approved on 10/17/91 (see court document no. 5793) of $3,096,489.00 plus additional amount approved on 1/23/92 (see court document no. 5866) of $22,788.80. Also includes interest per # 5895.

[9] Plus additional 1,000,000.00 in pending premium request [Has been paid base fee and expenses].

SECURED CREDITORS: $6,692,444.99 (SC PROFESSIONALS TOTAL FEES AND EXPENSES)

| Applicant | Fees and Expenses Approved |
|---|---|
| Eurodollar Term Loan<br>Syndicate 4314 (9/17/90) | $ 450,000.00 (Fees & Expenses) |
| Domestic Term Loan<br>Lenders 4315 (9/17/90) | $ 383,870.14 (Fees & Expenses) |
| Midlantic Nat'l Bank<br>Indenture Trustee 4316<br>(9/17/90) | $ 684,414.96 (Fees and Expenses) |
| IBJ Schroder Bank & Trust<br>4317 (9/17/90) | $ 906,026.81 (Fees and Expenses) |
| State Street Bank & Tr.<br>4318 | $ 309,720.22 (Fees and Expenses) |
| Bank of New England, N.A.<br>4359 | $ 556,202.14 (Fees and Expenses) |
| Maryland National Bank<br>Indent. Tr. 4630 (11/15/90) | $ 452,210.72 (Fees & Expenses) |
| Shearson, Lehman<br>5817 (10/31/91) | $ 200,000.00 (Fees & Expenses) |
| CitiCorp. & Consolidated<br>5834 (11/20/91) | $2,750,000.00 (Fees & Expenses) |
| TOTAL FEES AND EXP: | $6,692,444.99 |

STATE OF NEW HAMPSHIRE: $6,142,568.01 (TOTAL FEES AND EXPENSES)

| Applicant | Fees Approved | Expenses Approved |
|---|---|---|
| State of NH<br>5837 (11/20/91) | $5,477,172.68 | $665,395.33 |

UNITED ILLUMINATING: $2,980,000.00 (PROFESSIONALS' FEES AND EXPENSES)

Note: This is an aggregate of U.I. professionals' fees and expenses to support § 503(b) claim for benefit to estate as a competing utility bidder attempting to acquire the debtor.[10]

1penhfee

[10] Nothing yet allowed and hearing limited to question of *legal entitlement* only.

## OMNIBUS ORDER ON FINAL FEE AWARDS AND RELATED MATTERS

This Court by its separate Memorandum Opinion has made its findings and conclusions regarding the remaining applications for compensation from this estate. In accordance therewith, and incorporating those findings and conclusions by reference, it is accordingly

ORDERED, ADJUDGED and DE-CREED as follows:

1. Stutman, Treister & Glatt, as general counsel to the debtor-in-possession, are hereby allowed $4,344,707 as a final fee award, as being reasonable compensation pursuant to § 330(a)(1) of the Bankruptcy Code, and authorized reimbursement of $379,931.94 in expenses determined to be necessary and proper pursuant to § 330(a)(2) of the Bankruptcy Code.

2. First Boston Corporation, for financial advisor services rendered, is hereby allowed $3,570,297 as a final fee award, as being reasonable compensation pursuant to § 330(a)(1) of the Bankruptcy Code, and authorized reimbursement of $224,094 in expenses determined to be necessary and proper pursuant to § 330(a)(2) of the Bankruptcy Code.

3. First Boston Corporation under its retention for "M & A" activity, is denied any transaction fee or other compensation in accordance with the findings and conclusions set forth in the aforesaid memorandum opinion.

4. Rothschild, Inc., as financial advisor to the Official Committee of Equity Security Holders, are hereby allowed $3,090,000 as a final fee award, as being reasonable compensation pursuant to § 330(a)(1) of the Bankruptcy Code, and authorized reimbursement of $204,663 in expenses determined to be necessary and proper pursuant to § 330(a)(2) of the Bankruptcy Code.

4. Paul L. Gioia, as the Court appointed examiner, is hereby allowed an additional $200,000, for a total final fee award of $468,875, as being reasonable compensation pursuant to § 330(a)(1) of the Bankruptcy Code, and authorized reimbursement of $11,215 in expenses determined to be necessary and proper pursuant to § 330(a)(2) of the Bankruptcy Code.

5. The application of United Illuminating Company for an allowance of compensation under § 503(b) of the Bankruptcy Code is hereby disallowed pursuant to the findings and conclusions included in the aforesaid Memorandum Opinion.

DONE and ORDERED.